The FLEISCHMANN DISTILLING CORP., a corporation, etc., Appellants,

v.

MAIER BREWING COMPANY, a corporation, et al., Appellees.

No. 17696.

United States Court of Appeals Ninth Circuit.

Feb. 12, 1963.

Rehearing Denied March 19, 1963.

150

Brobeck, Phleger & Harrison, Moses Lasky, San Francisco, Cal., Davis, Polk, Wardwell, Sunderland & Kiendl and Porter R. Chandler, New York City, for appellant.

Mellin, Hanscom & Hursh, Oscar A. Mellin and Carlisle M. Moore, San Francisco, Cal., Hill, Farrer & Burrill and Robert Nibley, Los Angeles, Cal., for appellee.

Before POPE, BROWNING and DUNIWAY, Circuit Judges.

POPE, Circuit Judge.

Fleischmann Distilling Corporation, here called Fleischmann, filed in the court below its complaint for trademark infringement and unfair competition against Maier Brewing Company, here called Maier, and Ralphs Grocery Company, here called Ralphs, seeking an injunction restraining the defendants from using the name "Black & White" upon beer manufactured by Maier and sold by Ralphs. It asserted that such use of that name was an infringement of a trademark "Black & White" used on Scotch whisky manufactured abroad by James Buchanan & Company, here called Buchanan, and imported and sold by Fleischmann in the United States.

Jurisdiction in the court below was invoked by reason of the diversity of citizenship of the parties with the requisite amount in controversy, and also on the ground that it "arises under Acts of Congress relating to trademarks, [citing the Acts of February 20, 1905, and of July 5, 1946, hereafter referred to], and also asserts a related claim of unfair competition." Subsequently Buchanan filed a complaint in intervention against the same defendants adopting and incorporating therein Fleischmann's complaint and joining with Fleischmann in the prayer for relief.

Fleischmann and Buchanan, together will be referred to herein as plaintiffs. After trial to the Judge, sitting without a jury, the court below entered its findings of fact and conclusions of law and a judgment finding generally for the defendants and against the plaintiffs, dismissing the action and awarding the de-

fendants their costs. This appeal followed.

As the trial Judge noted in his opinion, the record presents no basic dispute as to the facts. Buchanan and its predecessor have blended and sold Scotch whisky under the name "Black & White" since before the turn of the century, and have marketed the product in the United States under that name for more than 50 years. Buchanan registered the name as its trademark for Scotch whisky in the United States Patent Office in 1908, and in California in 1911. The federal registration was renewed under the Act of 1946 in 1948. Fleischmann has been the sole importer of Black & White whisky in the United States since 1948.

With respect to this Scotch whisky the trial court found as follows: "8. 'Black & White' Scotch whisky is a widely known Scotch whisky. It is the leader among Scotch whiskies. Its sales have exceeded one hundred million bottles during the tenure of Fleischmann and more than five hundred thousand cases have been sold in the six year period between 1951 and 1957, in California, more than half of which were sold in Los Angeles County where Ralphs does business. In the alcoholic beverage industry the name 'Black & White' has come to mean Scotch whisky." During the six year period mentioned, the plaintiffs expended more than five million dollars in advertising their Black & White Scotch whisky.

Maier is a brewing company in Los Angeles, and Ralphs owns and operates a chain of grocery stores in that area. Maier brews a low price beer which it sells under a variety of different labels. In the summer of 1956, Ralphs was seeking to obtain an inexpensive beer for sale in its chain of stores under a label for Ralphs' exclusive use. The upshot was that Maier sold beer to Ralphs through a wholesaler under the label Black & White. In December, 1957, Maier was notified by attorneys for Buchanan that they considered Maier's use of the Black & White name a trademark infringement and unfair competition.

Maier was asked to discontinue using the name. A similar notice was sent to Ralphs the following May. These demands were refused and this suit followed.

Among the findings from which the trial court drew its conclusion that plaintiffs had not made a case against the defendants was Finding No. 28 as follows: "28. There is no real competition between plaintiffs' Scotch whisky and defendants' beer. This lack of real competition renders it unlikely that there is, or will be, any confusion as to source in the mind of a buyer." This finding seems to suggest that Buchanan, as owner of a registered trademark, would be foreclosed from recovery if there was no real competition between plaintiffs' Scotch whisky and the beer. We think this finding indicates a misconception of the law here applicable, and of the significance of lack of competition.

The earlier trademark Act, that of 1905 (33 Stat. 724 et seq.), provided that a right of action to suppress an infringement of a registered mark arose only if the infringement was used on "goods of the same descriptive properties" as the registrant's goods. However, the Lanham Act of 1946 (60 Stat. 427, 15 U.S.C. § 1051 et seq.) made plain that infringement might be found and prohibited, though the use of the registered mark was upon goods having different descriptive properties than those set forth in the registration, and though in consequence there was no actual competition between the parties. This Act prohibits use without the registrant's consent "of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services."

Thus the question to be determined here is whether the use by Maier and Ralphs of the name "Black & White" on their beer "is likely to cause confusion or mistake or to deceive purchasers as to

the source of origin of such goods or services." Before we examine the evidence here for the purpose of answering that question we must consider whether it is our function as an appellate court to furnish such an answer.

█ Numerous cases in this and other circuits hold that under the circumstances here present, the question of the likelihood of confusion is one for us to decide. In Sleeper Lounge Company v. Bell Manufacturing Co., 9 Cir., 253 F.2d 720, 723, this court quoted with approval the quotation in Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, that "we are in as good a position as the trial judge to determine the probability of confusion."

One reason for applying the rule of that case and of the other cases in accord cited in the margin[1] is that this determination of likelihood of confusion partakes more of the character of a conclusion of law than of a finding of fact. The inference to be drawn from the undisputed facts here are "derived from application of a legal standard." Lundgren v. Freeman, 9 Cir., 307 F.2d 104, 115.[2] Appellant asserts that this function of determining the likelihood of

confusion is for us, and this has not been challenged by the appellees.

We proceed then to the inquiry whether under the circumstances here shown the use of the name Black & White on defendants' beer is likely to cause confusion as to the source of origin. Another finding of the trial court which may tend' to explain the conclusion arrived at is Finding 22 as follows: "22. Scotch whisky and beer, although both containing alcohol, are goods of distinctly different properties."

For the reasons previously noted this finding is of no assistance in determining te question of likelihood of confusion. The Lanham Act has done away with the old concept of "goods of the same descriptive properties." We think that the trial court failed fully to appreciate this effect as is evidenced by the fact that in the court's opinion which accompanied' its findings, reliance was made upon certain court decisions all of which antedated the Lanham Act.

In support of its contention that the use of a name on unlike goods may be enjoined, plaintiffs have cited here a substantial number of cases illustrating

---

[1]. The manner in which this court has undertaken to exercise its function of determining for itself the question of likelihood of confusion is illustrated by the case of Safeway Stores v. Rudner, 9 Cir., 246 F.2d 826. In that case the trial court had found that there was no competition between plaintiff's retail grocery stores and defendant's retail furniture stores, and that there was no evidence of confusion between the two stores and no likelihood of confusion from the use by the defendant of the word "Safeway", which had previously been the trade name of the plaintiff. Accordingly the district court denied the injunction. This court, reversing, held that the evidence showed that "there was a likelihood—a probability, if not a certainty—that, unless enjoined, appellee's use of the trade name 'Safeway' would greatly and irreparably damage appellant." Other cases in which this court has reversed the trial court's denial of injunction based on the trial court's finding of no likelihood of confu-

sion are Mershon Company v. Pachmayr, 9 Cir., 220 F.2d 879; National Van Lines v. Dean, 9 Cir., 237 F.2d 688; Stork Restaurant Inc. v. Sahati, 9 Cir., 166 F.2d 348, and Audio Fidelity Inc. v. High Fidelity Recordings, Inc., 9 Cir., 283 F.2d 551. For decisions in accord with this holding in other circuits see: Sears Roebuck & Co. v. Johnson, 3 Cir., 219 F.2d 590, 591; Millworth Converting Corporation v. Slifka, 5 Cir., 276 F. 2d 443, 446; McCormick & Co. v. B. Manischewitz Co., 6 Cir., 206 F.2d 744, 746; California Fruit Growers Exch. v. Sunkist Baking Co., 7 Cir., 166 F.2d 971, 973.

[2]. "When a finding is essentially one dealing with the effect of certain transactions or events, rather than a finding which resolves disputed facts, an appellate court is not bound by the rule that findings shall not be set aside, unless clearly erroneous, but is free to draw its own conclusions." Stevenot v. Norberg, 9 Cir., 210 F.2d 615, 619.

that proposition.[2a] The defendants do not undertake to question those decisions but contend that they cannot be applied here because the mark "Black & White" belonging to the plaintiffs is not a distinctive or "strong" mark since the same name has been used on a great multitude of other products and for a variety of goods and services, and that as a result plaintiffs' trademark has been diluted and has lost its original distinctiveness and serves no purpose of pointing to goods from a single source.

The defendants produced evidence showing that the name Black & White had been applied and used by producers or dealers in a large number of different products. These included medicines, cosmetics, coffee, candy, bags, fountain pens, sheet music, hoof-rot remedy, corn meal, flour, soap, pencils, ginger ale, cotton prints, canned goods, and tobacco. Many of these marks were registered in the Patent Office and elsewhere.

The record shows, however, that the name Black & White has never been registered in the United States Patent Office for any alcoholic beverage other than Buchanan's Scotch whisky. In 1935, the St. Claire Brewing Co. of San Jose, California, began using the name Black & White as a trademark for bottled beer and had registered the mark for use on beer with the Secretary of State of the State of California. In 1936, National Distillers, which was then the sole importer in the United States of Buchanan's whisky, learned of St. Claire's use and in August, 1936, the St. Claire Brewing Company was notified on behalf of the American agents for Buchanan that the latter considered that St. Claire was infringing Buchanan's mark, and St. Claire was called upon to withdraw the Black & White beer from the market. In response St. Claire stated that it did not sell whisky or other beverages of that kind but used the Black & White label for beer and after calling attention to the other registrations of the name for coffee, flour, fruits, vegetables, medicines, etc., it disclaimed any infringement in view of the common use of Black & White and the wide difference between Scotch whisky and lager beer. At that time suit against St. Claire was threatened but none was taken as St. Claire got into financial difficulties, went into the hands of its creditors, and ceased to use the name in 1938.

We think the record shows and the findings confirm that Buchanan had a trademark valid both at common law and under the applicable federal acts. If it be proper to speak of trademarks as being "strong" marks or "weak" marks,[3]

---

2a. "13. For example, injunctions were granted in all of the following cases: Rolls-Royce automobiles enjoined 'Rolls-Royce' on radio tubes, Wall v. Rolls-Royce of America, Inc., 4 F.2d 333 (3 Cir. 1925), and successfully opposed 'Krolls Royce' on baby buggies, Kroll Bros. Co. v. Rolls-Royce, 126 F.2d 495, 29 C.C.P.A. 897 (1942); 'Seventeen' on clothes enjoined by 'Seventeen' magazine. Hanson v. Triangle Publications, Inc., 163 F.2d 74 (8 Cir. 1947), cer. den. 332 U.S. 855, 68 S.Ct. 387, 92 L.Ed. 424; Triangle Publications, Inc. v. Rohrlich, 167 F.2d 969 (2 Cir. 1948). 'Bulova' on shoes enjoined by watchmaker, Bulova Watch Co. v. Stolzberg, 69 F.Supp. 543 (D.Mass.1947). 'Philco' on razor blades enjoined by 'Philco' radios and storage batteries. Philadelphia Storage Battery Co. v. Mindlin, 163 Misc. 52, 296 N.Y.S. 176 (1937). 'Eskimo Kooler' on refrigerator cabinets enjoined by Eskimo Pie. Eskimo Kooler Corp. v. Eskimo Pie Corp., 235 F.2d 3 (7 Cir. 1956), cer. den. 352 U.S. 953, 77 S.Ct. 328, 1 L.Ed.2d 244. 'Fancee Free' outer garments enjoined by 'Fancy Free' undergarments. Fancee Free Manufacturing Co. v. Fancy Free Fashions, Inc., 148 F.Supp. 825 (S.D.N.Y.1957). 'Minute Maid' frozen meats enjoined by 'Minute Maid' frozen juice. Pure Foods, Inc. v. Minute Made Corp., 214 F.2d 792 (5 Cir. 1954), cer. den. 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697. 'Amos 'N Andy' work shirts successfully opposed by radio entertainers. Feldman v. Amos and Andy, 68 F.2d 746 (C.C.P.A.1934). 'Safeway' eye glasses successfully opposed by chain food markets. Safeway Stores, Incorporated v. Safeway Opticians, Inc., 68 U.S. P.Q. 332 (1946)."

3. See Sunbeam Lighting Co. v. Sunbeam Corporation, 9 Cir., 183 F.2d 969, 973.

**154**

Buchanan's mark was assuredly a strong one. As used here, Buchanan's "Black & White" is not a descriptive term, nor does it indicate anything that has the qualities of black and white. That which is black is something "so dark as to have no distinguishable color"; white is descriptive of something "of the color of pure snow; reflecting to the eye all the rays of the spectrum combined;—the opposite of black or dark." The mark used here has no such connotation.

Paraphrasing what we said of the trademark "Dutch Boy" in National Lead Company v. Wolfe, 9 Cir., 223 F.2d 195, 199, we can say that the trademark Black & White is not used "otherwise than in a fictitious, arbitrary and fanciful manner." [4] This was recognized in the findings of the trial court where in Finding 8, which we have quoted above, it was stated: "In the alcoholic beverage industry the name 'Black & White' has come to mean Scotch whisky". This can have no meaning other than that it has acquired an arbitrary, fanciful, and secondary meaning.

The statement just quoted from Finding 8 has one corollary which necessarily follows from it, and which may be properly added to it;—the Scotch whisky, which the name Black & White has come to mean, is Buchanan's Scotch whisky.

It is obvious that in approaching the question which is before us, as to whether the defendants' use of the name Black & White on their beer is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods, we must recognize that the use of the name Black & White in connection with some wholly unrelated products, goods or services, cannot possibly cause confusion or mistake, or lead customers to believe that the goods or services offered had any connection with Buchanan.

Thus, defendants produced telephone directories from such cities as Boston, New York, Detroit, Los Angeles, and Pittsburgh, Pennsylvania, showing the use of the name Black & White by numerous firms and businesses. These disclosed Black & White Cleaners and Tailors; Black & White Trucking Company; Black & White Chemical Company; Black & White Dinette; Black & White Hatters; Black & White Garage; Black & White Tire Company; Black & White Market; Black & White Funeral Home, and others. It also appears that there was a small chain of retail liquor stores in Oakland, California, called Black & White. This was noted in the court's findings, which stated that Buchanan did not know of these liquor stores until after the suit was begun.

With respect to St. Claire's use of the name Black & White on its beer, appellants assert that such use had become past history at the times relevant to the matters here in suit. Appellants note that the bulk of the plaintiffs' promotion of their Black & White product through advertising and otherwise, which brought about its recognized standing, was after St. Claire and its beer had ceased to exist. In this connection we think that appellant is correct. In view of the short time during which St. Claire used the disputed name we cannot infer any loss of plaintiffs' right or dilution thereof through the circumstances of such use.

Nor do we attach any importance to the fact, reflected in the findings, that the evidence discloses that in two instances Scotch whisky and beer having no common origin have been sold by different concerns under the same names. These names were "Ballentine's" and "Black Label". These had nothing to do with any of the parties to this suit; what the circumstances of that double use were

4. In that case we relied upon and quoted from Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629, dealing with the trademark "The American Girl" in connection with shoes. Some similar marks appear in the cases cited in appellants' footnote 13 which we have quoted above, such as the name "Seventeen" applied to a magazine, "Eskimo Pie" applied to an ice cream product, and "Minute Maid" applied to frozen juice.

does not appear. If in the past two other brewers did the same thing to other distillers as Maier is here charged with doing to Buchanan, that would constitute no defense or justification for the defendants here. Cf. National Lead Company v. Wolfe, supra, 233 F.2d at p. 204.

And while we recognize that a multitude of persons engaged in supplying wholly different and distinct sorts of goods or services and using the name Black & White would not be chargeable with any wrong toward Buchanan or its trademark, yet there is an area in which the use of that name by others on products that are not Scotch whisky would plainly lead to confusion and mistake of the kind prohibited by the Lanham Act. An illustration of such use would be adoption of the name Black & White by a distiller of Bourbon whisky. The question which we must answer is just where the line must be drawn between the uses of Black & White that would be unexceptionable and those that should be enjoined because of the likelihood of confusion.

We have noted the recital in Finding 8 that "in the alcoholic beverage industry the name 'Black & White' has come to mean Scotch whisky." We have also noted that this means Buchanan's Scotch whisky.

Of course there may not be one in a hundred buyers of this whisky who knows that it is made by Buchanan or wholesaled by Fleischmann. Probably all that such buyers know is that Black & White Scotch whisky has satisfied them in the past or that they have heard of it and the average purchaser would no doubt select for the use of his guests something with which he was familiar and thus purchase Black & White whisky. What are we to say about the same purchaser who starts for home on a hot evening and decides to take home beer for refreshment? He stops at Ralphs and notes beer bearing the label "Black & White" in that store's stock. We think it to be plain that the likelihood of confusion and mistake is present here and is established by the record.[5] Assuming that the trial court's finding that it is "unlikely that there is, or will be any confusion as to source in the mind of a buyer" is a finding of fact and not a legal conclusion, we hold that it is clearly erroneous.

■■ It is our view, and we so hold, that the average purchaser, as the courts have described him, would be likely to believe, as he noted the Black & White beer in Ralphs' stores, that the maker of the beer had some connection with the concern which had produced the well known Black & White Scotch whisky. It is not material whether he would think that the makers of the Scotch whisky were actually brewing and bottling this beer, or whether it was being produced under their supervision or pursuant to some other arrangement with them. He would probably not concern himself about any such detail.[6]

5. The customer who buys one of these products presumably has in mind the taste and desires of himself, his family and his guests. The known tastes and habits of one's anticipated guests would no doubt determine which product or how much of each the purchaser would take home.

   Plaintiffs' witness Baumgarten testified: "Well, again, as I said anything in the alcoholic beverage industry, we are all striving to get part of that business. If I go into a bar or a package store I might decide that I want a beer, or I might decide that I want a bourbon, a vodka, a gin or a Scotch. And if I go into a package store to take it home, or if I go in to have a drink at a bar, you are all in competition, in my opinion."

6. Cf. Callman, "Unfair Competition and Trade Marks", 2nd Ed. pp. 1361, 1362: "The varying degrees and types of possible connection are, of course, myriad, and whether any connection will be assumed by the public may well depend upon the custom in the trade, as it is known to the public, whether the custom be recognized by law or not. In this connection, the defendant's name may create the impression that it is a corporation affiliated with the business of the plaintiff, or a dealer may be assumed to be in a particularly close relationship with a producer, or a service station may invoke a name that falsely identifies it as a branch of a manufacturer." And see, L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272, 273:

In Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348, 359, this court had occasion to comment upon the fact that the ordinary purchaser has only general impressions with respect to an original product or its name. He probably does not know the name of the maker who owns the trademark. In that case we said: "The law is not made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearance and general impressions." It was argued there that one driving by an unpretentious night club displaying the sign "Stork Club" in or near San Francisco would hardly assume that the place was in any way affiliated with the celebrated New York establishment. This court then went on to say (p. 359): "It may well be true that a prudent and worldly-wise passerby would not be so deceived. The law, however, protects not only the intelligent, the experienced, and the astute. It safeguards from deception also the ignorant, the inexperienced, and the gullible."

As the trial court noted, we are dealing here with operations in the alcoholic beverage industry. It seems to us that necessarily the use on defendants' alcoholic beverage of Buchanan's trademark would be likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods.

The circumstances under which Maier began the use of this name on its beer are such as tend to confirm our conclusion as to the likelihood of confusion. A salesman who had once worked for St. Claire Brewing Company suggested the name Black & White to the head of Maier. Maier had been selling its beer to sundry customers under various labels and names and was then approached by one Molner, a wholesaler, with a view to procuring a beer which he could sell at wholesale to Ralphs Grocery Company under a name reserved for Ralphs only. Maier's general sales manager testifying, described the conversation with this wholesaler as follows: "Another thing discussed was the matter of a brand name that we could make available. At that time the only label we had available that we were not using or that was not in use by someone was Black & White Lager Beer, which we had one or two sample labels which Mr. Mosiman had given me some time ago of the label Black & White beer. We showed them to Molner and he brought up the question of Black & White beer, or, rather, the name Black & White also being used for Scotch. He was told that we knew there was a Black & White Scotch. It's one of the most popular brands of Scotch. But that from our check that had been made, the name Black & White had been used on beer as was evidenced by the label, the sample labels we had. It was not at the present time being used for beer any place else in the United States that we could determine. We knew it was not being used in California because we had checked with the Alcohol Control Board on price postings, and also that the brand was available—the brand name was available for use on beer. That was the end of it." When asked by counsel as to what he and the head of Maier considered with reference to the fact that there might be a conflict with Black & White Scotch if they adopted the name Black & White for beer, he testified: "I knew that there was and is a brand of Scotch Black & White, and I knew it was on the market. I knew it was one of the most popular brands on the market of Scotch. I could see no confliction between them— any possible confliction on the part of anybody between a can of beer on the one hand and a bottle of Scotch on the

"The theory on which the wrong has been extended to include the use of the mark on goods never made or sold by the owner, is that, though the infringer's user cannot at the moment take away his customers, it may indirectly do so by tarnishing his reputation, or it may prevent him from extending his trade to the goods on which the infringer is using the mark."

other, as to their being interchangeable, one product to the other." [7]

The trial court found that Maier adopted the Black & White label for beer "in good faith". If by this finding the court meant to say that Maier thought that under the law it had the right to use the label, no fault can be found with it. It is plain from the testimony quoted above that Maier was laboring under the same mistake of law which we have noted in the trial court's findings, namely, that since the goods had distinctly different properties, there was no real competition between whisky and beer, and hence that defendants' adoption of the label would be lawful because no confusion would be likely. But if the finding of good faith is intended to mean that defendants did not intend to adopt Buchanan's Black & White name or mark for the purpose of taking advantage of the aura of good will which surrounded the name, then the finding is clearly erroneous.

The manager knew that the Black & White Scotch "was one of the most popular brands on the market" and when the wholesaler brought up the question of Black & White also being used for Scotch, the manager told him that he knew there was a Black & White Scotch, "one of the most popular brands". Without seeking any legal advice these officers of Maier simply decided for themselves that there was no relation between Scotch whisky and beer and decided to go ahead.

We cannot conclude but that Maier deliberately adopted the name knowing that Black & White was the name and trademark of Buchanan and they must have done so with some purpose in mind.[8] The only possible purpose could have been to capitalize upon the popularity of the name chosen. This popularity, they must have known, would extend to their product because the public would associate the name Black & White with something old and reliable and meritorious in the way of an alcoholic beverage.[9]

It is well settled that plaintiffs were not obliged in order to make a case

---

**7.** Kalmanovitz, the head of Maier, testified in his deposition as follows: "Q. At the time you adopted the name of Black and White for your beer, did you give any thought to the fact that that was the same name that was being used on the Buchanan whiskey? A. Well, I had the knowledge that it was a Black and White scotch. Q. Did you think about it affirmatively, give any consideration to it when you adopted this label? A. I thought of it, but I couldn't find any relation, none whatsoever between whiskey and beer. Q. Did you have any discussion on that point with anyone else? A. Possibly, just passing remark. Q. You have no definite recollection of it? A. Well, I said possibly was some comments, nothing of any importance. Q. Well, did you remember any such comment? A. Yes. I believe somebody mentioned, that I hear some remarks, a slighting remark, not any consequences that stayed in my mind. Q. You say 'a slighting remark'; what do you mean by that? A. Well, I mean I drink scotch and I know Black and White. There is no question and there is a scotch product on the market Black and White. Q. You know that it is advertised extensively? A. Well, I don't know how extensively. Occasionally I see on the billboards here and there. I don't know any degree in the State of California. Q. You have no recollection, I take it, of discussing with any lawyer the question whether there would be a conflict in the names? A. No. Q. The thought occurred to you personally? A. None whatsoever. I was positive in my mind then as I am now there is no relation between Black and White scotch whiskey and Black and White beer."

**8.** The record shows not only a knowledgeable adoption of the name, but also an insistence on continuation of the imitation after notice to stop. See Restatements, Torts, § 716: "Moreover, regardless of the defendant's initial purpose or knowledge, an injunction for the future was deemed appropriate because continuance of the imitation after the notice was acquired in the suit would be tantamount to 'fraud' ".

**9.** Maier's manager testified that when the wholesaler Molner approached him they discussed the matter of a brand name. "At that time the only label we had available that we were not using or that was not in use by someone was Black & White Lager Beer." All that this can

against the defendants to prove a wrongful intent. Safeway Stores Inc. v. Rudner, 9 Cir., 246 F.2d 826, 829. But when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit. American Chicle Co. v. Topps Chewing Gum, 2 Cir., 208 F.2d 560, 562; Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, 603; National Van Lines v. Dean, 9 Cir., 237 F.2d 688, 692. As was said in the last cited case: "[I]f such an intent is shown, it raises a presumption that deception and confusion resulted." [10]

Furthermore, Maier knew, just as we do, that it had open to it a whole dictionary full of words, an encyclopedia full of proper names, and a world atlas full of place names from which to select a non-offending label. The evidence shows that at the time Maier was using no less than 21 separate names or labels.[11]

Appellees place much reliance upon the testimony of the witness Baumgarten. He was regional vice-president of Fleischmann. He was called to testify among other things as to the general reputation of Buchanan's Black & White Scotch whisky and as to the extent of advertising campaigns to emphasize the name Black & White. On cross-examination he testified: "Now, is it your contention, Mr. Baumgarten, that a customer would be confused in buying a can of Black & White beer put out by the Maier people that he was getting a product of Buchanan's? A. No. The only two very isolated instances, I was asked in Southern California by people who were in the business, 'When did you people start making beer?' And that is, as I said, only a couple of instances that that has happened. No, my answer is no to your question." Of course this is something more than a mere expression of an opinion by a witness. Baumgarten, as a regional vice-president of Fleischmann, would appear to be a person authorized to make admissions on behalf of Fleischmann. The question is whether this statement, which concludes with a negative answer as to whether there would be confusion of the kind we have been here discussing, was in the nature of a judicial admission such as an admission in a pleading which would operate to put the plaintiffs out of court.

There are decisions to the effect that a party is bound by his own testimony in the sense that the same constitutes a judicial admission so that the court is under a duty to find the facts in accordance with the testimony. Such a holding is criticized by Wigmore, (Wigmore on Evidence, 3d ed., § 2594(a)), and the California courts have agreed with Wigmore and quoted his criticism with approval. Richey v. Pedersen, 100 Cal.App. 2d 512, 519, 224 P.2d 100, 105; Weingetz v. Cheverton, 102 Cal.App.2d 67, 78, 226 P.2d 742, 749. Mr. McCormick, (McCormick On Evidence, § 243) notes that by no means is every sort of testimony of a party to be treated as a conclusive or judicial admission. Among the exceptions

mean is that Maier had found that no other beer was then being marketed under that name and Maier had obtained sample labels bearing the name. Maier never purported to have any connection with St. Claire. And at the time of this conversation the St. Claire company and its beer had been dead and gone 18 years.

10. See the discussion of this matter in Restatement, Torts, § 729, comment *f*.

11. These names were: ABC, Haufbrau, Steinbrau, 102, East Bavaria, Maier's Select, Padre, Rex, Black & White, Old Heidelburg, Old Time, Dodger, Better Foods, Cake, King Kole, Corey, McDaniels, Shoppers, Alpine, Golden Brew, Golden Grain.

Surely this list did not exhaust Maier's ingenuity. The only rational explanation for the insistence on using Black & White was to trade on the other Black & White's good will.

noted are cases in which the testimony of the party is in the nature of an opinion.[12]

We are not confronted with the necessity of passing upon that question here for the reason that Baumgarten, although an officer of Fleischmann, was not an officer or agent of Buchanan, and under no circumstances could his testimony be binding upon it. Even if we were to go so far as to assume because of Baumgarten's testimony that Fleischmann could get no relief here that would not affect Buchanan's rights on this appeal.[13]

When a newcomer takes the name Black & White and makes a use of it on a product which in the mind of the buyer is related to or associated with the product of the original trademark owner, we think it may be said that confusion as to the source of origin is likely to result. The use need not be the same as, nor one in competition with the original use. The question is, are the uses related so that they are likely to be connected in the mind of a prospective purchaser?

This is a test which was early applied by the Second Circuit in a somewhat similar case. That court was one of those which prior to the Lanham Act gave to the 1905 Act a liberal construction which anticipated the changes that were written into the Lanham Act to which we have previously alluded.[14] That case was Aunt Jemima Co. v. Rigney & Co., 2 Cir., 247 F. 407, 409.[14a]

We think it must be said here, as in the Aunt Jemima case, supra, that beer and Scotch whisky, being both within

12. "The rule is inapplicable, moreover" when the party's testimony "is an estimate or opinion rather than an assertion of concrete fact."

13. We have some difficulty in interpreting the testimony of Baumgarten which is quoted above. Although he referred to two instances in which people "in the business" asked when "did you people start making beer?" he followed that with an emphatic repetition of his answer "No," to the question whether a customer would be confused, in buying a can of Black & White beer, that he was getting a product of Buchanan's. Appellant argues that the reference to these two instances was evidence of actual confusion. Since the inquiry was made by those who were in the business and hence should know better, the trial judge may have been justified in believing that these inquiries were in the nature of jocular remarks used by way of banter. For this reason and because Baumgarten's opinion as to the issue to be decided by this court cannot bind us, we attach little weight to his testimony. Of course proof of specific instances of actual confusion is unnecessary in cases of this kind. La Touraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, 117; Abramson v. Coro, Inc., 5 Cir., 240 F.2d 854, 857; S. S. Kresge Co. v. Champion Spark Plug Co., 6 Cir., 3 F.2d 415, 419; Queen Mfg. Co. v. Isaac Ginsberg & Bros., 8 Cir., 25 F.2d 284, 288; Audio Fidelity Inc. v. High Fidelity Recordings, Inc., 9 Cir., 283 F.2d 551, 557.

14. See Robert, "Commentary on The Lanham Trade-Mark Act," appearing in 15 U.S.C.A. §§ 81–1113 (1948 ed.) p. 265, at 286: "Under the 1905 Act a right of action to suppress an infringement of a registered mark arose only if the infringement was used on 'goods of the same descriptive properties' as the registrant's goods. In its practical application, the phrase 'goods of the same descriptive properties' was construed strictly by some courts and liberally by others, with the inevitable result that no one knew precisely what it meant. Strict construction required that the goods be the same, and some courts held that there must be actual confusion of goods before relief could be granted. But many courts reasoned that if the goods were unlike but somewhat related, purchasers might mistakenly think that the goods of both parties emanated from the same source."

14a. The court held that the owners of the words "Aunt Jemima" as a registered trademark for self-rising pancake flour were entitled to an injunction against the defendants who used the same name on their pancake syrup. The court said (247 F. at pp. 409 to 410): "It is said that even a technical trade-mark may be appropriated by any one in any market for goods not in competition with those of the prior user. This was the view of the court below in saying that no one wanting syrup could possibly be made to take flour. But we think that goods, though different, *may be so related as to fall within the mischief which equity*

the alcoholic beverage industry, are "so related as to fall within the mischief which equity should prevent." And, as suggested in the Yale Electric Corporation case, supra, we cannot hold that Maier's use is so foreign to that of Buchanan's as to insure against any identification of the two.

It is not incumbent upon us here to express any opinion as to whether other uses of the name on products outside of the alcoholic beverage industry would or would not be infringement of the trademark. If the uses of the name by those who have thus registered it are so wholly unrelated and foreign to plaintiffs' use as to insure against any possible identification of the two then those registrations are immaterial and irrelevant here for that special reason. They could bring about no possible dilution of the plain-

tiffs' trademark, for Buchanan could have done nothing about them. In any event, as we have previously indicated, the use of the name by others, whether wrongful or not, is simply immaterial to this case, as we held in Safeway Stores Inc., v. Rudner, supra, and National Lead Company v. Wolfe, supra.

The court below, while stating that there is "an apparent conflict in the decisions" undertook to cite in its opinion five cases which it thought supported its views.[15] It is sufficient to say that we have carefully examined the cases thus cited and it is our opinion that they are all factually distinguishable from the case before us. It is elementary that in the decision of a case of this kind, involving the question of confusing similarity, each case must stand on its own facts, and prior decisions are of little assistance.[16]

*should prevent.* Syrup and flour are both food products, and food products commonly used together. Obviously the public, or a large part of it, seeing this trade-mark on a syrup, would conclude that it was made by the complainant. Perhaps they might not do so, if it were used for flatirons. In this way the complainant's reputation is put in the hands of the defendants. It will enable them to get the benefit of the complainant's reputation and advertisement. These we think are property rights which should be protected in equity." (Emphasis ours.)

The same court in Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, 973, granted the manufacturer of Yale locks an injunction against the use of "Yale" on flashlights. It was recognized that the manufacturer of locks did not make flashlights. The court said: "Therefore it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill?" The court then proceeded to answer this inquiry and said (p. 974): "However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal, by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within

his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. *And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful.*" (Emphasis ours.)

We are not prepared here to go so far as the Second Circuit did in the Yale Electric case; we are not required to do so for plainly whisky and beer are more "related" than locks and flashlights, and less "foreign" to each other. And we do not follow the suggestion of the emphasized statement that the burden of proof may be on the defendant. But the word "foreign" furnishes a useful test, as "foreign" is contrasted with "related".

15. The cases thus cited are: Arrow Distilleries v. Globe Brewing Co., 117 F. 2d 351 and Century Distilling Co. v. Ph. Schneider Brewing Co., D.C., 26 F.Supp. 936, aff. 10 Cir., 107 F.2d 699; Burger Brewing v. Maloney-Davidson Co., 6 Cir., 86 F.2d 815; Atlas Beverage v. Minneapolis Brewing Co., 8 Cir., 113 F.2d 672; Englander v. McKesson-Roeber-Kuebler, 120 N.J.Eq. 480, 185 A. 917.

16. Appellants cite the following cases asserted to be in square conflict with the decision of the court below: Four Roses Products Co. v. Small Grain Distilling & Drug Co., 58 App.D.C. 299, 29 F.2d 959

In addition it should be noted that the decisions relied upon by the trial court antedate the enactment of the Lanham Act and are distinguishable upon that ground.

This disposition of the case makes it unnecessary to consider appellants' argument that our case of Stork Restaurant v. Sahati, supra, is authority for the proposition that wholly apart from any likelihood of confusion as to the origin of a product, a trademark owner may enjoin use by another which results in dilution of the distinctiveness of the owner's mark. Since we have found likelihood of confusion here we need not consider this argument.[17]

And because we have found adequate legal support for our conclusion in the Lanham Act, we do not consider here the appellants' argument that the California law, statutory and decisional, compels the same conclusion.

We notice one conclusion of the district court (No. 13), which can have no bearing upon the decision of this case. That conclusion reads as follows: "13. The defendants, by using the name 'Black & White' on beer, have not infringed the plaintiffs' trademark rights in plaintiffs' combination mark of the words 'Black & White' and two Scottie dogs." The facts are that Buchanan has two federal trademarks;—one is the Black & White mark which we have previously discussed, and the other, which it registered at a later date, consisted of the combination of the words "Black & White" and a picture of a pair of Scottie dogs, one of them black and one of them white. The evidence shows that Buchanan had used both trade-marks on this whisky. The first one, "Black & White" appears on the label on the front of the bottle; the combination trademark,—the Scottie dogs combined with the words Black & White,—appear on the label on the back of the bottle. This action was brought for infringement of the first trademark using the words Black & White alone. It is not alleged that the other trademark was infringed by the defendants and the fact that the Scottie dogs do not appear on defendants' beer is immaterial and irrelevant. Conclusion No. 13 is also irrelevant.

The trial court found that the labels and containers used by the defendants were so distinct from those used by plaintiffs that they would not tend to deceive or confuse. Such variation as existed in the labels here is insufficient to protect the defendants against the injunction sought. An examination of the whole range of decisions in this field brings out one conclusion,—that an infringer seldom makes a Chinese copy of another's trademark, package or label. As stated in Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 33, 21 S.Ct. 7, 45 L.Ed. 60, "It is not necessary to constitute an infringement that every word of a trade-mark should be appropriated. It is sufficient that enough be taken to deceive the public in the purchase of a protected article."

It is the general public, the unskilled purchaser, who is entitled to protection; and in determining whether there is a likelihood of confusion we must remember that the members of the purchasing public have only general impressions which must guide them in the selection of products. We think that the purchaser of a carton of beer in Ralphs' grocery store would have no way of pulling from his pocket a precise copy of Buchanan's label to compare with the label on the beer. His general impression relates to the name "Black & White" and that is the extent of his knowledge ordinarily.

We hold therefore that the court below was in error in denying the injunction prayed for.

(1928), Ex Parte American Wine Co., 90 U.S.P.Q. 15 (Commr. of Patents, 1951) and Dubonnet Wine Corp. v. Ben-Burk, Inc., 121 F.2d 508, 28 CCPA 1298 (1941).

17. See Callman, "Unfair Competition and Trade Marks" (2d ed.), Vol. 3, pp. 1642 to 1645.

The judgment is reversed and the cause is remanded to the district court with directions to enter judgment in accordance with this opinion. The question of plaintiffs' right to an accounting, not having been dealt with on the previous trial, remains for decision by the district court.