**PLAYMAKERS, LLC, Plaintiff(s),**

v.

**ESPN, INC., et al., Defendant(s).**

No. C03–2894P.

United States District Court,
W.D. Washington,
At Seattle.

Dec. 16, 2003.

Kari L O'Neill, Katherine Hendricks, Hendricks & Lewis, Seattle, WA, for Plaintiff.

Jennifer Johnson Millones, Marc E. Ackerman, Robert L. Raskopf, White & Case, New York City, Scott A.W. Johnson, Shannon M. Jost, Stokes Lawrence, Seattle, WA, for Defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

PECHMAN, District Judge.

This matter comes before the Court on plaintiff's motion for an order of preliminary injunction under trademark law directing that defendants be enjoined from using the "Playmakers" mark in association with their television series. (Dkt. No. 13) Specifically, plaintiff Playmakers, LLC

brought this lawsuit against defendants ESPN, Inc., ABC Cable Networks Group and Orly Edelson Productions, alleging primarily that there is a likelihood of confusion between defendants' use of the "Playmakers" mark in association with the television series and plaintiff's prior use of the mark in association with sports agency services, such as contract negotiation representation and career counseling. Having considered the papers and pleadings submitted by the parties, and having heard oral argument on the issues, the Court hereby DENIES the motion, as the Court finds that there is not a substantial likelihood on the merits of the reverse confusion claim (at least on the present record), and that the balance of the hardships actually weighs in favor of defendants, rather than sharply in favor of the moving party.

## BACKGROUND

This is a case of alleged trademark infringement. Plaintiff PlayMakers, LLC ("the LLC") is a small "sports agency" whose services include representation of athletes in contract negotiations with professional sports teams, procurement of endorsement and appearance contracts, and professional sports career guidance. ESPN is a multimedia sports entertainment cable network that specializes in broadcasting sporting events, commentary, and sports-related entertainment television series. Relevant to the present lawsuit, ESPN promotes and airs a dramatic series called "Playmakers," which touts its behind-the-scenes look at the lives of professional football players. The other two defendants, ABC Cable Networks Group and Orly Edelson Productions, are allegedly involved in the writing and production of the "Playmakers" series.

On June 21, 2003, ESPN began advertising the "Playmakers" series in various means, including on television, radio, the Internet, billboards, and the like. On August 26, 2003, the "Playmakers" ran its series debut. The program depicts professional football players both on and off (mostly off) the field, and includes scenes of football players using steroids, womanizing, using illegal drugs, and generally being discriminatory. *See* Lay Decl. Ex. 1 (video tape containing two episodes of "Playmakers"). Plaintiff has submitted a large amount of documentation of criticisms of the show, in particular articles quoting players and coaches in the National Football League ("NFL"). O'Neill Decl. Exs. 8–32. Although the first season ended on November 11, 2003, ESPN intends to re-air the first season episodes, and to air future seasons of new episodes.

Plaintiff brings this lawsuit alleging federal trademark infringement and related claims over ESPN's use of its registered trademarks involving the word "Playmakers." The LLC has provided documentation of its registration of its "PLAYMAKERS" mark. The first is a "word-mark" in International Class 35, for "agency services, namely, representing and advising professional athletes and aspiring professional athletes in contract negotiations with professional sports teams and in endorsements and appearances." O'Neill Decl. Ex. 1. The second is a "word plus design" mark in the same class and description. *Id.* Ex. 2. Both marks have now become "incontestable" pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065, affording conclusive evidence of the validity of the LLC's "PLAYMAKERS" mark, its ownership of the mark, and its exclusive right to use the mark *in connection with the services identified* in the registration under 15 U.S.C. § 1115(b).

The LLC's primary contention is that ESPN's use of the mark threatens to overwhelm plaintiff's good will associated with the mark through possible confusion be-

tween the somewhat controversial television series and the LLC's services. Under a slightly different theory, the LLC is particularly concerned with a negative association with the name "PlayMakers" among aspiring and professional football players that may tarnish any positive association these customers have with the "PlayMakers" mark in conjunction with plaintiff's services. On these grounds, the LLC has brought the present preliminary injunction motion seeking an order enjoining ESPN and the other defendants from using the "PlayMakers" mark in association with its television series and related merchandise.

## ANALYSIS

### A. *Preliminary Injunction Standard*

■ "A plaintiff is entitled to a preliminary injunction in a trademark case when he demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in his favor." *Brookfield Communications Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir.1999). The primary focus of this analysis, however, is on the probability of success on the merits, as irreparable injury is presumed once a plaintiff has established a likelihood of confusion in a trademark case. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n. 5 (9th Cir.2000); *Int'l. Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir.1993).

### B. *Reverse Confusion/Likelihood of Confusion*

■ Plaintiff styles its motion as relating to "reverse confusion" trademark infringement. "Reverse confusion" is a theory of trademark infringement in which an extensively used, yet junior, mark is used in the same or similar industry such that consumers will likely believe that plaintiff's use of its mark originates from and/or was authorized by the defendant. As in any other trademark infringement suit brought under § 32 of the Lanham Act, in order to establish a probability of success on the merits the plaintiff must establish that the defendant is using a mark "confusingly similar" to that of the plaintiff's valid, registered, and protectable mark. *GoTo.com*, 202 F.3d at 1205. At the preliminary injunction phase, therefore, the plaintiff must demonstrate that it is likely that it will be able to show a likelihood of confusion. *Brookfield*, 174 F.3d at 1052 n. 15.

■ To assess the likelihood of confusion, the Court considers a non-exclusive set of factors, which have become known as the *"Sleekcraft"* factors, which include: 1) the strength of the senior mark; 2) proximity of the services provided by the parties under their respective marks; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) the type of services and the degree of care likely to be exercised by purchasers; 7) defendant's intent in selecting the mark; and 8) the likelihood of expansion of the services. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979). No single factor is determinative, and the Court need not rigidly apply equal weight to each. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993).

Plaintiff would have the Court look primarily at three factors, dubbed by the Ninth Circuit as the "controlling troika." *GoTo.com*, 202 F.3d at 1205. However, as defendant points out, such a limited analysis is confined to Internet trademark cases. The Court in this case finds it more

useful to evaluate each of the factors in turn, assigning differing weight as seems appropriate.

### 1. *Strength of the Marks*

■ The strength of the plaintiff's mark in a trademark infringement case will often determine the breadth of the mark's protection—the stronger the mark, the greater the protection it is afforded. *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1455 (9th Cir.1991). Strength is discussed in terms of "conceptual" strength and "commercial" strength. Conceptual strength relates to the distinctiveness of the mark, for example whether the "arbitrary or fanciful," or is "suggestive," or is merely "descriptive." *See Dreamwerks Production Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1130 n. 7 (9th Cir.1998). A mark may also acquire strength through its use in the marketplace, otherwise known and commercial strength; this acquired strength can be shown through length and manner of use of the mark, the amount and volume of advertising, and the volume of sales. *See E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F.Supp. 472 (N.D.Cal. 1991). In a reverse confusion case, the court looks at the commercial strength of the *junior* mark. *Dreamwerks,* 142 F.3d at 1130 n. 5. This is because in a situation of reverse confusion, the concern is that a very strong junior mark will overwhelm the senior mark, capturing or confusing the senior's customers.

Here, plaintiff's mark appears to be somewhat conceptually weak. First, the word itself "playmakers," as plaintiff has so adeptly demonstrated, is not arbitrary or fanciful, such as Kodak or Pepsi. Rather, it is a commonly used word in the sports industry to refer to a player who makes the big plays, who comes through in

the clutch. This is also not a case where a common word is used in an arbitrary way. *Dreamwerks,* 142 F.3d at 1131 n. 7. On the other hand, the Court agrees with the plaintiff that the use of the term "playmakers" does not instantaneously bring to mind sports *agency* service, and is therefore not merely descriptive. The Court finds that the mark is more "suggestive" in nature, and is therefore deserving of moderate protection on this basis. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir.1992).

■ Plaintiff makes much of the incontestability of its mark. Yet an incontestable mark may be sufficiently strong for registration purposes, i.e. not "generic," but may still be relatively weak for likelihood of confusion purposes. *See e.g., Gruner + Jahr v. Meredith Corp.,* 991 F.2d 1072 (2d Cir.1993).

In analyzing commercial strength, however, it appears to the Court that ESPN's use of the mark is extraordinarily vast, making it an extremely strong junior mark. Plaintiff has submitted numerous articles from various publications demonstrating the widespread recognition of the Playmakers television series, in particular within the NFL. ESPN has attested to the vast resources that have been spent advertising its dramatic series over the course of several months. The relative strength of the two marks is also relevant in the sense that a relatively strong junior mark in comparison to the senior mark will tend to lead to the swamping effect that is the concern of the "reverse confusion" analysis. Here, ESPN's mark is far stronger than that of the LLC. There is therefore a likelihood that ESPN's mark will overwhelm that of the LLC within (at least a portion of) the relevant market (professional football players and those aspiring to be). This is of course offset somewhat

by the conceptual weakness of plaintiff's mark.

Overall, the strength of mark factor weighs in only slightly in favor of a finding of likelihood of confusion. Plaintiff's mark is suggestive and therefore conceptually somewhat weak, yet is nonetheless deserving of some protection, and ESPN's mark is exceptionally strong.

### 2. *Proximity of the Services Provided*

Whether the parties' services are related is extremely important—perhaps second only to similarity—and the Court places great weight on this factor. Related goods or services are those that, though not identical, are related in the minds of the consumers. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1363 (9th Cir.1985). Where the goods or services compete for sales with those of the senior user, there is more likely to be confusion if the marks are sufficiently similar. *See e.g., Sleekcraft*, 599 F.2d at 348. There may also be confusion where two products are sufficiently similar that consumers would think that one was sponsored by the other. *See Triangle Publications, Inc. v. Rohrlich*, 167 F.2d 969 (2d Cir.1948).

The Court finds that the services provided by the two parties are not sufficiently similar to cause confusion. Plaintiff offers sports agency services to professional athletes, including football players. ESPN produces a television series about football players. These services simply are not alike. The fact that they both relate to sports in general is too remote to raise an inference of confusion. Furthermore, the touchstone of this factor is whether the services are so similar that "consumers" would likely be confused. Here, the relevant consumers of plaintiff's services are professional athletes, while the relevant consumers of defendant's TV series is primarily football *fans*. These consumer bases are not the same, as the relevant services provided are not the same. This is related to a certain extent to the differing marketing channels as discussed below.

Overall, the Court finds that the proximity of services provided by the parties under their respective marks are not sufficiently similar to cause a likelihood of confusion. The parties are *not* in competition. Therefore, this factor weighs against granting a preliminary injunction.

### 3. *Similarity of the Marks*

The most important factor in any likelihood of confusion analysis is the similarity of the marks. Without similarity, there can be no confusion. The Ninth Circuit has developed certain "axioms" to guide the comparison:

> [F]irst, the marks must be considered in their entirety *as they appear in the marketplace;* second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities weighed more heavily than differences.

*GoTo.com*, 202 F.3d. at 1206 (emphasis added).

Comparison of the visual appearance of two marks can involve consideration of color of lettering and/or background, font or typeface, and the overall style or appearance of the marks. While the Court recognizes that the marks consist of the same word, which in each case is spelled the same, the marks as used in the marketplace are visually quite different. Plaintiff's mark as it appears in the marketplace consists of two separate words, "PLAY" and "MAKERS." The mark includes a number of stars, one of which takes the place of the "A" in "Play Makers." Plaintiff's mark also contains large letters "P", "M" and "S" in comparison to the other letters. The letters are a royal

blue, while the star "A" is a khaki green. The whole mark is on a white background.

Defendant's mark, on the other hand, contains only the single word "PLAY-MAKERS." There are no stars or other designs on the mark, and the word is set on a dark blue or black background. All the letters are the same size. The two portions of the entire "playmakers" word are different colors, with "play" being in white, and "makers" in blue that changes hue from one end to the other. Furthermore, the fonts of the two marks is different.

While each of these comparison points shows differences in various visual elements of the two marks, what is critical is the *overall* appearance of the mark as used in the marketplace, not a deconstructionist view of the different components of the marks. The Court finds that the visual appearance of the marks on the whole, as used in the marketplace, is noticeably different.

In terms of sound, the marks are identical. This is uncontested, and in fact ESPN makes no mention of this factor in its briefing. The meaning is also identical; again, this is uncontested and unmentioned by ESPN. As the Ninth Circuit has directed, similarities are to be weighted more heavily than differences. Nevertheless, the Court finds that the substantial differences in visual appearance outweigh the similarity in sound and meaning. In the overall analysis, the Court finds that this all-important factor does not weigh in favor of a likelihood of confusion. While "consumers" may get confused when they hear the two marks, there is little chance of confusion between the two marks in a visual sense.

This is particularly true in light of ESPN's use of its house mark "ESPN" in close proximity to the contested mark. While this sub-factor can cut either way, in this case, the Court finds that ESPN's use of its home mark in conjunction with the "Playmakers" mark *decreases* the likelihood of confusion.

### 4. *Evidence of Actual Confusion*

Plaintiff does not provide any evidence of actual confusion. This factor therefore does not weigh either in favor or against a finding of likelihood of confusion.

### 5. *Marketing Channels Used*

Another important factor is a comparison of the channels through which the parties' products or services are marketed. This is because the similarity of the marks must be considered in the context in which they are encountered in the marketplace and in view of the circumstances surrounding the purchase of the goods or services. *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988). Examples of marketing channels include the type of market (retail or wholesale), point of sale, type of retail establishment, and methods of advertising. *See e.g., E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F.Supp. 457 (N.D.Cal.1991).

█ Plaintiff contends that the marketing channels are somewhat similar. For the LLC, advertising channels include word-of-mouth, direct mail, and a presence at national sporting events. Defendants' mark, on the other hand, is advertised primarily through mainstream channels, such as television commercials, radio, billboards, and the like. Plaintiff claims that advertising takes place through word-of-mouth as well, in particular by means of the negative attention it had received in the NFL. This seems a bit of a stretch, since if anything, negative attention and talk are negative advertising. But more importantly, the Court finds that "word-of-mouth" is in fact not "marketing." Mar-

keting is any method used by a promoter of a product or service in which the promoter controls the message. "Word-of-mouth" advertising is not controlled by the promoter, and therefore cannot be used to establish a likelihood of confusion. Overall, this factor weighs against a finding of likelihood of confusion.

### 6. Consumer Care in Purchasing

In evaluating this factor, the Court looks to the "typical buyer" of the products or services at issue exercising ordinary care. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 156 (9th Cir. 1963). The more expensive a good or service, the more likely a consumer will be to exercise a greater amount of care in making the purchase. *Sleekcraft*, 599 F.2d at 353.

Plaintiff tends to downplay this factor, but defendant makes a convincing argument that *plaintiff's* relevant consumers are likely to exercise a great deal of care in choosing an agent to represent them. This factor weighs against a likelihood of confusion.

### 7. Intent of the Defendant in its Use of the Mark

■ Plaintiff asserts that defendant acted in bad faith when it used the mark for its television series. While it is true that registration and incontestability result in nationwide constructive notice of ownership of the mark, there is no presumption of bad faith just because someone knew that a senior user existed. Even if such a presumption did exist, it could only hold true when the junior user entered the same class or provided similar services. Such is not the case here. There is no evidence of bad faith on the part of ESPN.

### 8. Likelihood of Expansion of the Services

This factor is not even addressed in plaintiff's briefing, and will not be discussed here.

### 9. Synthesis of the Factors

Taken as a whole, the Court finds that there is not a likelihood of success on the merits because there is not a likelihood of confusion between the plaintiff's and defendants' marks. Those factors that weigh in favor of a finding of likelihood of confusion are somewhat weak, while those weighing against are more convincing. While the Court does not partake in "bean-counting," in the present case the Court finds particularly persuasive the visual dissimilarity of the marks, the differences in the services provided, the differences in marketing channels used, and the relatively weak conceptual strength of the mark. Having considered all of the relevant factors in depth, the Court finds that the relevant consumers are not likely to confuse the marks, and that the injunction should not issue.

### C. Creation of a Negative Connotation—Tarnishment

This is not a factor in the likelihood of confusion analysis.

■ Simply put, the LLC is concerned that negative associations with the word "playmakers" are being created by the content and controversial nature of defendant's television series. Plaintiff in fact makes much of this concept of "tarnishment" throughout its likelihood of confusion analysis. But defendant is correct that this a dilution argument. Although plaintiff argues for what amounts to a new theory of tarnishment and its proper place within the landscape of trademark infringement, tarnishment has always been viewed as a form of dilution. Dilution is a

liability theory that is invoked when a senior mark that is *distinctive* and *famous,* is "diluted" by a junior's use of the mark, essentially eroding the strength of the association of plaintiff's product with the mark. For example, if someone started marketing Kodak tennis balls or Pepsi gasoline, those companies would likely be able to bring a dilution action against that user. "Tarnishment" is a form of dilution in which the junior user places the famous mark in a bad light, generally one that involves sexual activity, obscenity, or illegal activity. *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 507 (2d Cir.1996).

The Court declines to adopt a new theory of tarnishment to be used in the straightforward reverse confusion context. Tarnishment is a form of dilution. In the present case, plaintiff's mark is neither distinctive nor famous—plaintiff does not seriously argue to the contrary. There has to be something to tarnish in order to find dilution by tarnishment. Further, the Court notes that where a plaintiff chooses a mark that is relatively conceptually weak (i.e. is not fanciful or arbitrary), that plaintiff runs the risk that a future user of the known word will create a negative connotation to be associated with that word. That is especially true in the present case where the plaintiff's mark cannot be considered "famous."

### D. *Balance of the Hardships*

 Even if the above discussion could be construed as one involving "serious questions going to the merits," which the Court does not find, the balance of the hardships does not tip "sharply in favor" of granting the injunction. In fact, on this record, the Court finds that the balance of the hardships tips in favor of the defendant.

The Court notes from the outset that plaintiff has put forth very little in the way of what investments have been made and what hardships may befall the plaintiff if defendants are not enjoined from using their mark in association with their television series. There is very little evidence in the record of how active a company the LLC actually is. For example, there is nothing to show how much it has lost or would lose absent an injunction. There is no evidence of advertising expenses. There is no evidence of active, current representation of professional football players, or how many contracts the LLC has negotiated on their behalf.

On the other hand defendants have put into evidence specific amounts of money that have been invested in the creation and promotion of the program, as well as future sales of advertising for re-runs of prior programs and future seasons. Further, it is likely that if defendants were forced to rename their program at this time, defendants would have to terminate the program, and all of the investment to date would be lost. While the Court does not make a finding of bad faith delay in bringing the lawsuit and this motion, the fact that plaintiff did not bring them sooner has resulted in increased cost and intangible hardship to the defendant if an injunction were to be entered, and this the Court cannot ignore. The balance of the hardships in this case weighs in favor of the defendants.

### CONCLUSION

The Court finds, for purposes of preliminary injunction, that the record does not reflect a likelihood of success on the merits in favor of plaintiff. Even if there were a serious question on the merits, which the Court does not find, the balance of the hardships actually tips in favor of the de-

fendants. The motion for preliminary injunction is therefore denied.

The Clerk is directed to send copies of this order to all counsel of record.