**M'OTTO ENTERPRISES, INC., Plaintiff,**

v.

**REDSAND, INC., a California Corporation, Defendant.**

No. C92–954GW.

United States District Court,
W.D. Washington,
at Seattle.

July 16, 1993.

Rex B. Stratton of Stratton Ballew Richardson, Seattle, WA, for plaintiff.

Darrell L. Olson and Joseph R. Re of Knobbe, Martens, Olson & Bear, Newport Beach, CA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILSON, United States Magistrate Judge.

### INTRODUCTION

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby makes the following Findings of Fact and Conclusions of Law:

### I. JURISDICTION AND VENUE

1. This is a declaratory judgment action brought by M'Otto Enterprises, Inc. ("M'Otto") against Redsand, Inc. ("Redsand"), seeking a judgment that M'Otto's "Red Eraser" caricature does not infringe Redsand's marks or images. PreTrial Order ("PTO") at ¶ 2.

2. Redsand counterclaimed against M'Otto for trademark infringement under 15 U.S.C. § 1114, and for unfair competition under 15 U.S.C. § 1125(a) and Washington state and common laws. PTO at ¶ 3.

3. The Court has subject matter jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1338(a), and 15 U.S.C. § 1121. The Court has original and pendent jurisdiction over the state claims pursuant to 28 U.S.C. §§ 1332(a), 1338(b) and 1367(a). PTO at ¶ 1.1.

4. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400. PTO at ¶ 1.2.

### PROCEDURAL POSTURE OF THE CASE

This matter came on for a bench trial April 26 and 27, 1993 before United States Magistrate Judge David E. Wilson, sitting with the consent of the parties pursuant to 28 U.S.C. § 636(c), and Magistrate Rule (M.R.) 13 of the Local Rules for the United States District Court for the Western District of Washington. Plaintiff M'Otto Enterprises, Inc. was represented by Rex B. Stratton of Stratton Ballew Richardson (Seattle, Washington), and Defendant Redsand, Inc. was represented by Darrel L. Olson and Joseph R. Re of Knobbe, Martens, Olson and Bear (Newport Beach, California).

The Pretrial Order sets forth numerous, detailed statements of admitted facts and exhibits. Due to the detail set forth in the Pretrial Order, counsel, by agreement, sought to provide the Court with evidence with respect to matters not already admitted, or which went toward supporting a party's contested factual contentions.

At the conclusion of the trial, the Court declined to rule on the case from the bench, took the matter under advisement, and requested that both sides prepare proposed findings of fact and conclusions of law and submit them to the Court. The Court, having had an opportunity to review the parties proposed findings and conclusions, hereby enters its findings of fact and conclusions of

law. In doing so, the Court has, in addition to the respective proposed findings of fact and conclusions of law presented by each side, carefully considered the case from the standpoint of the totality of the evidence, and based its conclusions on a review of the transcript of the record of trial; the exhibits; the Court's trial notes; the Court's appraisal of the demeanor of the witnesses; and a review of the authorities cited by the respective parties.

## FINDINGS OF FACT

### Ultimate Issue Before the Court

This case concerns whether Plaintiff M'Otto's adoption and use of the RED ERASER and graphic design mark, either alone or in combination with the RED ERASER® mark, is likely to cause confusion, or to cause mistake, or to deceive the public with regard to Defendant Redsand's REDSAND® character marks or the likeness of Steve Timmons, and if so, what appropriate remedies may be fashioned to rectify the situation?

The specific images at issue are Plaintiff's Red Eraser caricature (Exhibit A, hereto), Defendant Redsand's caricature of Steve Timmons (Exhibit B, hereto), Plaintiff Red Eraser work mark (Exhibit C, hereto), and Defendant Redsand's work mark (Exhibit D, hereto).

### The Plaintiff

M'Otto is a Washington corporation, formed in 1983, and having its principal place of business in Seattle, Washington. Since as early as March 1983, M'Otto has sold wearing apparel and related accessories under the M'OTTO®, M'OTTO RED DOT®, M'OTTOKIDS®, and M'OTTO INTERNATIONAL® trademarks, as well as other trademarks, including DESPERADO®, SARA JEAN®, ONLY STUFF® AND CREDO®, depending upon the style and design of the line of clothing.

M'Otto, together with its affiliated companies, designs, manufactures, and sells its own

label as well as private label clothing through numerous stores in the United States, Canada, and many foreign countries. M'Otto markets its own brand of men's, women's, and children's clothing and accessories through independent sales representatives and agents with offices in Los Angeles, New York, Dallas, Chicago, Seattle, Puerto Rico, and Vancouver, Canada.

Since its inception in the United States, M'Otto has sold, at wholesale, over $80 million in clothing and has current annual wholesale sales in excess of $15 million.

M'Otto's clothing designs and styles vary from casual to dress up. For example, DESPERADO® and SARA JEAN®, *supra*, are western or blue jean concept labels, while M'OTTO INTERNATIONAL® and CREDO® are more upscale sportswear lines. Since 1987, M'Otto has developed a line of children's wear under the mark M'OTTOKIDS® and M'OTTO RED DOT®.

M'Otto identifies its corporate image and trademark recognition with the color red. (Tr. 52).[1] M'Otto owns the trademark M'OTTO RED DOT®, Registration No. 1,559081 issued October 3, 1989. M'Otto also owns a registered trademark for a RED button, as the last button on a shirt, Miscellaneous Design Registration No. 1,588,975 issued March 27, 1990. The red dot has always been a part of M'Otto's trademark. (Plaintiff's Exhibit 1).

M'Otto markets its products primarily through specialty shops, specialty chain stores, such as Ron Robinson and Jay Jacobs, and department stores such as The Broadway, Dayton–Hudson, Bon Marche, Dillards, Kohls, Macy's, Nordstrom and Liberty House.

M'Otto also manufactures and sells under private label to Eddie Bauer, J.C. Penney, Costco, Pace, and Sam's.

### The Defendant

Redsand, Inc. was founded by Steve Timmons ("Timmons") in late 1985, and has mar-

---

1. The parties do not disagree as to many, if not most, of the operative facts of the case. Where disagreement does exist, is material, and is apparent to the Court, citations to the record are included, indicating some of the bases for the Court's conclusions. "Tr." refers to the transcript of the trial on April 26–27, 1993.

keted a line of sportswear since 1986. Timmons, an Olympian and professional volleyball player, stands 6'6" tall, is nicknamed "Red," and has distinctive red hair worn in a high flat-top haircut. Timmons was a star on the United States men's volleyball team in its win over Brazil for the gold medal in the 1984 Olympics. He also participated on the United States volleyball team which won the gold medal in the 1988 Olympics, and also played on the 1992 Olympic Volleyball Team which won the Bronze medal.

Timmons is the recipient of substantial national media coverage including major network Olympic coverage, major network and cable coverage of the beach volleyball circuit, major network interviews and competition, and substantial national press coverage. This media coverage includes frequent reference to Timmons' red, high, flattop haircut. As an example, Timmons and his flattop hairstyle received worldwide notoriety in the 1992 Olympics when he and the rest of the U.S. Volleyball team shaved their heads in support of a team member whose head is bald for medical reasons and whose technical foul cost the U.S. team a victory. Exhibits A–82 to A–84.

Since at least 1986, Redsand's sportswear has carried a stylized likeness of Timmons complete with sunglasses and flattop, as shown in Exhibit B hereto ("Timmons Caricature").

Timmons filed for and received a U.S. trademark registration to his caricature, U.S. Registration No. 1,505,035, issued September 27, 1988. Timmons assigned the registration to Redsand in June 1989.

Since 1986, along with Timmons caricature, Redsand has employed the image of Timmons in a variety of ways on its sportswear, including loop labels, hangtags and screen printed patterns on the garments.

Timmons' image is also used in point-of-purchase promotional materials such as decals, posters and banners. Timmons' image is also used in print advertising. In addition, Timmons testified that he acts as the promotional goodwill ambassador for Redsand, hosting in-store clinics where he signs autographs and instructional clinics where he teaches volleyball.

Due to Timmons' notoriety, Redsand also receives substantial unsolicited media coverage.

Redsand also employs the word REDSAND in a variety of logo styles in the sale of its sportswear. One of the styles used on hang tags, decals and signs since at least 1990, is shown in Exhibit D hereto.

Redsand has licensed the likeness of Timmons to C & C Partners for the manufacture and distribution of its sportswear. Redsand has also licensed the likeness of Timmons to Wilson Sporting Goods for the manufacture and sale of volleyballs.

For the first few years of its existence, Redsand sportswear was essentially a line of beachwear. Now, Redsand offers a more complete line of activewear, including T-shirts, tank tops, fleece sweatshirts, walking shorts, pants, woven shirts and hats. Tr. 237. Recent print ads show Timmons in non-volleyball settings. Tr. 239–40; Exs. A–97, A–98.

Redsand's target customers are young, active males, aged 18 to 24. However, there is some evidence that the line appeals to a broad range of buyers, including women. Tr. 242.

Redsand's major sales regions are the Pacific Northwest, Florida and California. Tr. 242. Redsand's sportswear ranges in retail price from $15 for T-shirts, with the bulk of the products averaging about $35–40, retail. Tr. 242.

Redsand sportswear is distributed through specialty stores and department stores such as Nordstrom, Dayton–Hudson, and Macy's. Redsand sells its sportswear nationwide.

Since March, 1986, Redsand has sold over $15 million worth of its sportswear. In 1992, Redsand sold over $6 million worth of its sportswear. Since March 1986, Redsand has expended over $600,000.00 in advertising. PTO at ¶ 4.73.

Redsand promotes its sportswear at trade shows, including the Action Sports show, held twice a year in San Diego, California.

Redsand has enforced its REDSAND and Timmons caricature marks against others, including Montgomery Ward, who acknowledged the validity of Redsand's Timmons caricature and REDSAND word mark. Tr. 264.

### M'Otto's Creation of RED ERASER Trademark

In the fall of 1989, M'Otto requested John Koval and Kim Hutchins, professional writers, to suggest a number of names which could be used for "intent to use" trademark applications to be filed after November 15, 1989, when the provisions of the Trademark Law Revision Act of 1988 became effective, allowing applications, for the first time, to reserve trademarks for future use. A list of over sixty (60) words was composed. (Plaintiff's Exhibit 79). Of the word marks generated for M'Otto by Koval and Hutchins, six intent-to-use applications were filed for: EVOK, SLANT, ZERO, O POINT O, A GNU ROO and RED ERASER. After the applications were filed, M'Otto elected to continue to prosecute only three of the applications, namely: EVOK®, A GNU ROO®, and RED ERASER®.

There is no evidence that at the time of the adoption of the "Red Eraser" word mark, M'Otto had knowledge of, or intent, or desire to trade on the REDSAND® trademark or persona or likeness of Steve Timmons. (This issue will be dealt with in greater detail, *infra.*)

M'Otto's intent-to-use trademark application under 15 U.S.C. § 1051(b) for the "Red Eraser" word mark was mailed to the United States Patent and Trademark Office on November 15, 1989. The original mail room receipt date of November 15, 1989 was canceled. The intent-to-use application was subsequently, successfully resubmitted and was given a Mail Room Date of December 22, 1989, under Serial No. 74/013,294. (See Plaintiff's exhibit 85).

M'Otto's application for registration of the word mark "Red Eraser," was passed for publication by the examining attorney without comment. No opposition to M'Otto's intent-to-use trademark application for the word mark "Red Eraser" was filed by any third party, and on September 4, 1990, a Notice of Allowance pursuant to 15 U.S.C. § 1063(b)(2) was issued to M'Otto by the United States Patent and Trademark Office.

Having reserved the "Red Eraser" word mark, with an effective date of first use as of December 22, 1989, no use was made in commerce of the word mark "Red Eraser" until February, 1991, when a private label shirt order was delivered to a California department store. (A "private labelling" situation typically occurs where a manufacturer sells goods to retailers, each of whom selects a different label to identify themselves, not the manufacturer, as the source of the good.)

The first use of the RED ERASER mark in commerce resulted from a request made in December, 1990 by Ina DiGrazia, an independent multiline sales representative, who needed to fill a 10,000 piece private label shirt order for the Broadway department store chain in Los Angeles. Ms. DiGrazia had accepted the order from Broadway but the order was rejected by another shirt manufacturer, Berkeley, which she also represents.

M'Otto's president, Simpson Ma, agreed to supply the Broadway order, which was to be shipped in January or February 1991. In a telephone conversation, Ina DiGrazia asked Mr. Ma if M'Otto had available any marks for use as a private label for the Broadway order. Mr. Ma read a list of six or seven names over the telephone to Ms. DiGrazia who selected the name "Red Eraser."

For a hang tag to be used on the private label shirts, Ms. DiGrazia had suggested some form of pencil with an eraser as a graphic design for a hang tag logo. She wanted something that was 90's feeling, forward and young and "cool" looking.

During a brief brainstorming session, the concept of the rapper-haircut for a cartoon character was suggested by the immediate boss of Mark Dellplain, Creative Director for M'Otto. Dellplain's boss was an avid basketball fan, and thought that the "eraser" haircut (shaved sides and flat top) which was popular with many black athletes, could be adapted by making the caricature have red hair. (Tr. 40). At the time, Dellplain had

never heard of Redsand or Steve Timmons, and was not to hear of them until he heard of them in connection with the lawsuit. (Tr. 50). Although he had attended one Action Sports Show at which Redsand had a booth, in either 1988 or 1989, he did not see Redsands logo at that Show. (Tr. 57). (The Court watched Mr. Dellplain closely during his testimony, and finds him to be a credible witness on these points.)

Because of the short turn-around time in which M'Otto had to meet Ina DiGrazia's private label order, the "Red Eraser" graphic design was created in the afternoon of January 13, 1991 by Lisa Emi Cheung, one of M'Otto's in house graphic designers, based on an earlier drawing of a cartoon character, created in 1989 by Brenda Iwa–Elento, another of M'Otto's in-house graphic designers, who had conceived the earlier drawing for a line of M'OTTOKIDS® known as "Four to Seven." Because of the time pressures, Iwa–Elento was told to look in the collection of old, unused drawings in the company's files to see if any of them could be utilized. The earlier drawing had not been used as a part of the children's clothing line, and had lain in M'Otto's file cabinet ever since. (Tr. 33–34). It was resurrected and given a new shock of red hair, standing erect, to become the pencil headed "Red Eraser." (Tr. 41–42). As with Mr. Dellplain, the Court finds Ms. Cheung was a credible witness as to the origin of the design.

The label layout was created the same afternoon by M'Otto's Creative Director, Dellplain, who used a straightforward helvetica font with the first three letters reversed out and because it was "so boring," he added a diamond between the words "red" and "eraser."

At the end of the day on January 13, 1991, the graphic design for the "Red Eraser" hang tag was faxed to Simpson Ma, President of M'Otto, at his Vancouver, B.C., Canada office. Based on the faxed copy of the RED ERASER® + graphic design art work for the hang tag, Simpson Ma decided to use the mark "Red Eraser" plus the "Red Eraser" graphic design for the Broadway private label order. The graphic art work was then faxed to Hong Kong so a woven neck label

could be made in time for shipment of the order.

In February, 1992, M'Otto shipped the 10,000 unit private label order to the Broadway department stores in California.

On July 12, 1991, a Statement of Use under 37 C.F.R. § 2.88, based upon the sale of Red Eraser brand shirts to the Broadway Department Stores in February 1991, was filed, claiming a date of first use of as early as "February, 1991," and submitting neck labels in the style and design shown in Exhibit 85 as specimens.

Registration No. 1,665,442 for the mark RED ERASER for clothing and wearing apparel, namely, shirts, pants, and hats in Class 25, (U.S. class 39) was issued to M'Otto by the United States Patent and Trademark Office on November 19, 1991.

M'Otto owns the copyright for the "Red Eraser" graphic design, United States Copyright Registration No. VAU 200 083, issued March 4, 1991, the date it was filed with the Commissioner of Copyrights.

*The Creation of a RED ERASER Line of Street Clothing*

At the same time as Mr. Ma approved the RED ERASER and Red Eraser graphic designs for use on the Broadway private label order, he also showed the art work to Ken Whale, a salesman for Oceanic Sportswear, Ltd. ("Oceanic"), a M'Otto affiliate in Canada. Mr. Whale asked if he could use the RED ERASER trademark and Red Eraser graphic design for a limited line of private label clothing he was trying to develop for private label customers in Canada. Mr. Whale had created a limited number of samples for a new line of casual clothes. The line being created by Mr. Whale was a new look for M'Otto. It was fleece and knit based, which was a very different style and look from M'Otto's traditional woven cotton lines. Mr. Whale was looking for a label to go along with his new casual look and he liked the Red Eraser mark and the graphic design created for the Broadway private label shirt order.

The new clothing line, and with it, the "Red Eraser" trademark and Red Eraser

graphic design, were introduced "in concept form" by Ken Whale to M'Otto's sales representatives during the February, 1991 M'Otto "fall season" pre-line which was being held at M'Otto's headquarters in Seattle.

The new line of "Red Eraser" casual wear was presented the following month to a broad spectrum of apparel buyers at the March, 1991, MAGIC ("Men's Apparel Guild in California") trade show in Las Vegas. Mr. Whale had approximately six to eight sample garments with him and the new line was shown in M'Otto's ONLY STUFF® booth because it was still considered a private label line and not a M'Otto Red Dot line. As explained by Simpson Ma and Darwin Smith, a private label line does not command the same prices as does a sportswear manufacturer's brand.

Although some interest was shown in the new line, no orders were taken for the Red Eraser private label line. Also, at the March, 1991 MAGIC show, Simpson Ma was told by Stacy Fisher, the private label buyer for the Broadway that the Red Eraser label meant nothing to her customers and that she wished to use the ONLY STUFF® mark for future private label business with the Broadway. At this point, the Red Eraser line and concept was not considered particularly promising by Simpson Ma. (Tr. 139).

After the March, 1991 MAGIC show, Wally Barger, M'Otto's newly hired national sales manager for M'Otto women's division, saw the RED ERASER samples developed for Ken Whale and asked and received permission to show the label to some key accounts around the country to see if he could get the label going as a new brand under the women's division.

In April 1991, Mr. Barger recolored Ken Whale's samples and took an eight (8) piece sample line of a new RED ERASER brand line to show to his major department store accounts at the New York Market Week. In New York, Mr. Barger showed the line to Frederick Atkins, Mercantile Stores, Jordan Marsh of Boston, ZCMI of Denver, Lazarus of Cincinnati, Rich's of Atlanta, AMC Buying Office, Dillard's Department Store–All Division (St. Louis, Ft. Worth, San Antonio, Little Rock and Phoenix), Higbees, Abbey Cas-tle, Dayton's of Minneapolis, and the Bon Marche of Seattle.

Mr. Barger then went to Los Angeles for the L.A. Market Week, where he showed the line to The Hub of Ontario, Ca., Contempo Casuals, Directives West, WET SEAL, Frederick Atkins, L.A., Madrigans of Illinois, and the Broadway of L.A.

Because of the successful reception which the newly created RED ERASER women's line received, significant orders were entered and M'Otto began production for fall 1991 delivery of RED ERASER brand apparel.

*REDSAND'S Opposition to RED ERASER*

On December 24, 1991, the RED ERASER + graphic design mark, Serial No. 74/149,220 was published for opposition.

On August 24, 1992, Redsand, Inc. filed an opposition to M'Otto's application, Serial No. 74/149,220 which is now pending before the United States Trademark Trial and Appeal Board under Opposition No. 88,847.

M'Otto also filed a trademark application for the "Red Eraser" graphic design alone, Serial No. 74,149,329, which was passed by the trademark examining attorney for publication in the Official Gazette for opposition on June 9, 1992. However this application has been abandoned by agreement to resolve an opposition filed with the Trademark Trial and Appeal Board by *Fido Dido, Inc. v. M'Otto Enterprises, Inc.,* Opposition No. 88,-608.

M'Otto has never sought to market its RED ERASER® brand products through the use of any professional athlete endorsement or through sponsorship of any professional sport. (It is, of course, Defendant's contention that M'Otto has marketed its apparel in such ways as to suggest that its products are sponsored or endorsed by Steve Timmons or Redsand, a contention with which the Court will deal below. With the exception of this central disputed contention, however, Defendant does not contest the proposition that M'Otto has not utilized professional athletes in its advertising or sponsored any professional sports activities).

The clothing styles and designs which are sold under the RED ERASER® mark have been evolving since the line's introduction in Spring 1991. The RED ERASER® line is a fashion sportswear collection which is carried by stores as a coordinated group. The mark is used on children's wear, on an extensive line of women's wear, and on a selection of men's wear.

Robert Lusitana, Redsand's Chief Operating Officer, testified that Redsand's RED-SAND® and Steve Timmons image was a hard core, cool, winner type image directed to, and created for, men. (Tr. 265–66). The target group of customers is 18 to 24 year old active males, although the line appeals to a broader age group, and enjoys some cross-over business from women who buy the line. (Tr. 242).

Most would agree that the Red Eraser character (Ex. A) is in no sense a "hard core, cool, or winner type" image. Plaintiff's view that he is a "silly little guy" is not inaccurate.

Both Timmons and Lusitana expressed concern that the cartoonish Red Eraser character, if associated with Redsand, would dilute Redsand's hard core, athletic image.

### Confusion Between the Marks

Defendants established several instances of confusion concerning the two lines, at both the retailer and consumer levels.

In September, 1991, Judy Sheehan, a retailer with 20 years experience in the sportswear field saw Steve Timmons at a trade show and exclaimed, "There's the RED ERASER man!" (Tr. 207–208). This same retailer, who sells both RED ERASER and REDSAND clothing, could recall at least two occasions when young consumers looking at RED ERASER sweatshirts in the store thought the RED ERASER character was the "volleyball guy" whose posters hang in the store. In fact, the posters in question were of Steve Timmons. (Tr. 209–210).

In July 1992, a consumer examining RED-SAND T-shirts carrying Timmons' caricature in one store thought she had seen the same brand down the street. In checking, the store owner discovered that the competitor down the street was selling RED ERASER clothing carrying the Red Eraser caricature. (Tr. 196–96.)

In October, 1992, after a sales presentation by a M'Otto representative, a retail store owner, who sells REDSAND clothing, thought the RED ERASER character was just a caricature of Steve Timmon's RED-SAND mark. (Tr. 213). A few days later, in the same store, a consumer, seeing the RED ERASER catalog on the counter where it had been left by the representative, asked if the clothing in the catalog was the new RED-SAND line. (Tr. 216).

In December, 1992, Nordstrom's department store in Seattle displayed both RED-SAND and RED ERASER fleece sweatshirts on a single table featuring a sign promoting REDSAND fleece sweatshirts and a price. (Tr. 178–79.)

In April, 1993, at a local trade show in Seattle, two buyers for retail stores entered a Redsand display booth, one stated that she had seen a REDSAND jacket at a previous show in Los Angeles. After discussing the "REDSAND jacket" with a Redsand sales representative, the second buyer remarked that the jacket which they had seen in Los Angeles was in fact a RED ERASER product. The two buyers then immediately left the Redsand booth. (Tr. 181).

And, two young consumers in a retail outlet thought that a REDSAND T-shirt carrying Timmons' caricature hanging on a wall was the same as a RED ERASER T-shirt displayed across the room. Hearing this, the retail store owner placed the REDSAND and RED ERASER shirts side-by-side and asked the consumers if they looked the same. The consumers replied, "No, but isn't it the same?" The owner responded, "No, it is not. They're two different companies." (Tr. 200–201).

### CONCLUSIONS OF LAW

■ The parties agree that "likelihood of confusion" is the basic test for all counter-claims in this suit. (Plaintiff's Proposed Findings of Fact and Conclusions of Law and Judgment, No. 68 ["Pl Prop.Find."]; Defendant's Proposed Findings of Fact and Conclusions of Law, No. 59, ["Def.Prop.Find."].)

■ In determining whether each side is entitled to the relief they respectively seek, the Court must first determine whether Timmons' likeness and caricature are protectable and whether the use of the RED ERASER caricature with accompanying logo is likely to cause confusion. *New West Corp. v. NYM Company of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir.1979).

Under Redsand's unfair competition and false designation of origin claims, all of Redsand's uses of the likeness or caricature of Steve Timmons are entitled to protection. Even unregistered uses of marks or images are entitled to protection under these claims. *Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir.1981). With respect to the trademark infringement cause of action arising under 15 U.S.C. § 1114, the Court must focus on Redsand's registered trademark.

Section 1125(a) of Title 15 provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

*Redsand has Protectable Rights in Its Marks and Images*

· *The REDSAND Word Mark and Timmons Caricature are Protectable*

■ Protectable marks function as source identifiers, not merely as descriptive words or ornamentation. *Charles of the Ritz Group, Ltd. v. Marcon, Ltd.*, 635 F.Supp.

158, 159 (S.D.N.Y.1986). Because Redsand has a United States trademark registration to the mark REDSAND and the caricature of Steve Timmons, it is entitled to a strong presumption that its registered mark is protectable. 15 U.S.C. §§ 1057(b), 1115(a); *America Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 106 (2d Cir.1978). Even if Redsand had no registration, the marks are distinctive based upon their widespread use and recognition. Here, M'Otto admits that the registered Timmons' caricature is a strong mark. (Tr. 290).

*Timmons' Image is Protectable*

■ In addition to its Timmons' caricature, Redsand uses the likeness and image of Timmons in different ways in selling and promoting its sportswear. This image is also protectable. Twice during the past year, the Ninth Circuit has held that the likenesses and images of famous personalities are protectable under 15 U.S.C. § 1125(a) and the law of unfair competition. *See White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1399–1401 (9th Cir.1992), *amended* (9th Cir.1992), *and cert. denied*, — U.S. —, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993); *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1110–11 (9th Cir.1992); *see also, Prudhomme v. Proctor & Gamble Co.*, 800 F.Supp. 390 (E.D.La.1992); *Allen v. Men's World Outlet, Inc.*, 679 F.Supp. 360 (S.D.N.Y.1988); *Allen v. National Video, Inc.*, 610 F.Supp. 612 (S.D.N.Y.1985).

In several of these cases, the courts have protected celebrity personas from another's commercial exploitation, even though the celebrities themselves did not use their likenesses as trademarks to sponsor products. Here, Timmons uses his image and likeness as a trademark in selling goods which compete with those sold by M'Otto, and uses his image in caricature form, as M'Otto uses a caricature in the form of its RED ERASER character. Moreover, as evidenced by the media attention, Timmons and his hairstyle have attained a degree of fame. Timmons' image is protectable.

*The Analysis of the Factors Governing the Resolution of the Likelihood of Confusion Issue, Weigh in Redsand's Favor*

In closing argument, counsel for M'Otto eloquently argued that there was no substan-

**1500**

tial "likelihood of confusion" in this case, but concluded with the observation that "if this Court finds that there is a likelihood of confusion in this case, then it should also find that the likelihood of confusion is dispelled with a disclaimer." (Tr. 309). In their proposed findings, M'Otto goes one step further and concedes that it would be appropriate for the Court to find "that a possible likelihood of confusion exists between the competing marks—REDSAND® and RED ERASER® and graphic design," but proposes "that the balance of the equities favors a limited form of injunctive relief which will permit Plaintiff to continue use of its RED ERASER® + graphic design mark with an appropriate disclaimer worded to protect Redsand or Steve Timmons or both from association with or endorsement of M'Otto's RED ERASER® line." (Pl.Prop.Find. No. 80 at 31). Defendant, on the other hand, has no objection to Plaintiff's use of its RED ERASER® name, but objects to Plaintiff's use of "the caricature shown in Exhibit A hereto or any mark or image which is confusingly similar to the caricature of Steve Timmons shown in Exhibit B or the likeness of Steve Timmons," or "the logo shown in Exhibit C hereto, or any logo which is confusingly similar to the logo of Redsand, Inc. shown in Exhibit D" (Def.Prop.Find., "Judgment" Section at 23–24).

As Redsand is concededly entitled to some degree of relief, whether in the form it desires or in the more limited option suggested by M'Otto, it is appropriate to examine the recognized standards governing the area of "likelihood of confusion," since the cases in that area not only define the issue, but bear on the appropriate remedy.

■ The parties agree that the leading case on the issue in this Circuit is *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979), which sets out eight factors to be considered in deciding whether there is a likelihood of confusion. Courts have also applied the eight *AMF* factors in claims under 15 U.S.C. § 1125(a) involving appropriation of the names or images of famous personalities. *See, e.g., White v. Samsung, supra,* 971 F.2d at 1400; *Prudhomme v. Proctor and Gamble Co., supra,* 800 F.Supp. at

393. The eight factors as applied to this case are: (1) strength of the REDSAND marks and the images of Timmons; (2) proximity of the goods of the parties; (3) similarity of the marks and images; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) M'Otto's intent in selecting its mark; and (8) likelihood of the expansion of the product lines. The presence or absence of any one of these factors is not determinative. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290–91 (9th Cir.1992).

When making a determination of likelihood of confusion, the Court should resolve any doubts in favor of Redsand, the senior user. *Kimberly–Clark Corp. v. H. Douglas Enterprises, Ltd.,* 774 F.2d 1144, 1147 (Fed.Cir. 1985).

*The Strength of the REDSAND Marks and Images*

The Ninth Circuit has stated:

A strong mark is one which is used only in a 'fictitious, arbitrary and fanciful manner, ... whereas a 'weak' mark is a mark that is a meaningful word in common usage, ... or is merely a suggestive or descriptive trademark.... A 'strong' mark is entitled to a greater degree of protection than is a 'weak' one because of its unique usage.

*New West,* 595 F.2d 1194, 1201–02 (9th Cir. 1979).

M'Otto has admitted that Timmons' caricature is a strong mark. (Tr. 290; Pl.Prop. Find. No. 71). M'Otto argues, however, that its own mark is also strong, and that there is less likelihood of confusion with two strong marks, since each stands on its "own merit." (*Id.*) M'Otto views the willingness of such retailers as Nordstrom, the Bon Marche, Macy's, and Dayton Hudson to carry *both* lines of clothing as an indication that they and other retailers see no danger of confusion. (*Id*). From this, and from the fact that M'Otto has not sought to expand its market into the volleyball community, where Timmons and Redsand began their business and maintain a strong presence, M'Otto concludes that the admitted strength of the

REDSAND® mark "is not a factor that weighs against M'Otto." (Id).

The strength of the junior mark is not a factor recognized by the courts in weighing the likelihood of confusion. *AMF, Inc. v. Sleekcraft Boats, supra,* 599 F.2d at 348–49. Nor is the existence of third party marks having some similar features (i.e., a head), a fact weakening Redsand's mark. *See, Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 154 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963).

The carrying of both lines by retailers, which Red Eraser repeatedly stresses, is in no sense conclusive on the issue of confusion. The retailers in question may well have sound and legitimate business reasons for carrying both lines, even if they were convinced that there was a likelihood of confusion. (Such a likelihood may be simply immaterial, if carrying both is otherwise profitable.) Plainly, their interest in the matter does not necessarily track that of the parties to this suit, and in truth the fact that they agree to carry both product lines adds substantially to the likelihood of confusion by creating convergent market conditions.

Nor is it correct that strong marks make confusion with others marks less likely, since the courts have recognized that a mark's strength may in fact make confusion much *more* likely. *AMF, supra,* 599 F.2d at 349. One of the authorities cited by Red Eraser for the opposite conclusion, *B.V.D. Licensing Corp v. Body Action Design, Inc.,* 846 F.2d 727 (Fed.Cir.1988), has not stood the test of time and appears to have been subsequently rejected by the Federal Circuit in *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 354 (Fed.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992). Similarly, the District Court's opinion in *Car–Freshner Corp. v. Scentex, Inc.,* 12 U.S.P.Q.2d 1361, 1989 WL 47373 (N.D.N.Y.1989), also quoted by Plaintiff, does not seem to square with the Second Circuit's opinion in such cases as *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir.1987).

While no one factor listed in *AMF* is controlling, the edge goes to Redsand in considering the factor of the "strength of the mark."

### PROXIMITY OF GOODS

Plaintiff appropriately concedes that the "goods are clearly in the same proximity" (Pl.Prop.Find. No. 72), but argues that the fact that apparel magazines establish that there are so many additional brands competing in style, design, and logo recognition, renders the factor of proximity "neutral." (*Id.*)

The Court finds evidence in the record supporting Plaintiff's arguments regarding the contents of such magazines (*e.g.,* exs. 101, 103), but the existence of such competitors does not neutralize the issue of proximity in this case. The competing goods marketed by the parties, are, as Plaintiff admits, "clearly in the same proximity," competing directly with each other, and that proximity weighs in on the side of Redsand.

*Similarity of the Parties' Marks and Images*

The parties agree that the Court is required to examine the marks as wholes and not dissect them into portions for more detailed inspection. (Pl.Prop.Find. No. 73; Def.Prop.Find. No. 76). In addition, the law dictates that a "side-by-side" comparison is inappropriate, since that is generally not the condition under which the purchaser will encounter them. *Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 192 (5th Cir.1981); *see also, Geigy Chemical Corp. v. Atlas Chemical Industries, Inc.,* 438 F.2d 1005, 1007 (C.C.P.A. 1971). The essential issue is whether the purchaser will be able to distinguish the mark before him from another which may be in his memory.

It is true, as Plaintiff Red Eraser urges, that there are differences between the caricatures, in that the Redsand one is a "harder," "cooler," and more "aggressive" mark than the Red Eraser caricature. (Exs. A, B). Yet it is the Court's finding that the similarities between the two are more persuasive that the differences. Each uses the head of a man with a pronounced flattop, and Red Eraser's decision to make what it admits is

its character's "flattop" (Tr. 296) red in color, adds to the likelihood of confusion. It may be true, as Plaintiff argues, that a detailed examination and comparison of the two dispels at least some of that likelihood of confusion, but, as noted above, that is not the test.

The logos used by the competing parties (exs. C, D) are very similar, despite the different words used. Their similarity is such that they might well appear confusing even in a "side-by-side" test, if such were appropriate.

Moreover, there is evidence in the record of actual confusion at both the merchant and consumer levels, as summarized below.

Given the evidence presented in this case, it is clear that the similarities of the parties' marks and images have added to the "likelihood of confusion."

### Evidence of Actual Confusion

The controlling case in this Circuit recognizes that evidence of "actual confusion" (as opposed to the "likelihood of confusion") is "persuasive proof that future confusion is likely." (*AMF*, 599 F.2d at 352.) It also recognized that proving actual confusion was "difficult." (*Id.*) In this case, Defendant Redsand has presented proof of actual confusion at both the merchant and the consumer level. (See p. 1498, *supra*.) That proof may not establish that actual confusion has been rampant or persuasive, but it does rise to a level above the "*de minimus*" level to which Red Eraser would consign it. (Pl.Prop.Find. No. 74). It is persuasive proof, even if it is not conclusive proof.

### Marketing Channels

Plaintiff Red Eraser agrees that there is "no question that convergent marketing channels exist in this case" (Pl.Prop.Find. No. 75). Plaintiff urges that the existence of such convergent market channels does not carry the force in the apparel industry that it might in other industries, and again, points to the fact that specific retailers carry both brands. (*Id.*) *AMF*, however, teaches that convergent market channels definitely add to the likelihood of confusion. 599 F.2d at 353. Here, the convergent market channels include department store chains, specialty stores, geographical markets (i.e. emphasis by both parties on the California market), similar pricing on some items, and overlapping customers, primarily in the youth to young-adult age groups.

The Court can not conclude, as Plaintiff repeatedly argues, that convergent market channels in this instance are in some way the obverse of those in the numerous other industries in which this problem has arose and been considered by the courts: i.e., that they in some way *reduce* the likelihood of confusion, rather than *increase* that likelihood. Plaintiff's argument goes against the existing law in this area.

### Types of Goods and Purchaser Care

Again, the parties do not disagree with the test in this area, i.e., what is the likelihood of confusion by the typical buyer exercising ordinary caution. *AMF*, 599 F.2d at 353. The Court finds persuasive Defendant Redsand's arguments that the types of goods (relatively inexpensive athletic and sportswear) and the typical buyers (youths and young adults), indicate that the buyers are "not likely to exercise a great deal of care in distinguishing between trademarks when purchasing the goods." (Def.Prop.Find. No. 87). The contrast between the purchaser care one would expect as to these goods, and that which one would expect in the case of those purchasing power boats for several thousand dollars (e.g. *AMF*), need not be belabored. (Even in the field of expensive power boats, however, the *AMF* court found that that factor did not eliminate the likelihood of confusion. 599 F.2d at 353.)[2]

The evidence on this factor is plainly more favorable to the position of Defendant Redsand.

### Intent

The evidence before the Court does not establish that M'Otto was aware of Redsand and its marks at the time it created the RED ERASER caricature and logo. The Court was particularly interested in the testimony of those actually involved in the creation of

---

2. "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." (*Id.*)

the marks on behalf of M'Otto, and in the testimony of Simpson Ma, who ultimately made the decision to go forward with the creation of his artistic employees. Having carefully watched these witnesses, listened to their testimony, weighed their demeanors, and compared their representations with any conflicting evidence presented, the Court finds Plaintiff's contention that those involved in the creation of the marks were unaware of Redsand and its senior marks, to be credible. It is true, as Defendant Redsand urges, that one or more of those involved in the creation of the Red Eraser marks, including Simpson Ma, had previously been in a position to encounter Redsand's senior marks, but the Court finds Plaintiff's sworn testimony that no such M'Otto employee had any recollection of such a previous exposure to Redsand's marks, to be believable and not contradicted by any direct evidence to the contrary.

To say that the Red Eraser mark was born in good faith, does not, of course, end the discussion. "Good faith is less probative of the likelihood of confusion, yet may be given considerable weight in fashioning a remedy." *AMF,* 599 F.2d at 354.

While Plaintiff does not contend that M'Otto set out to "palm off" goods by deceiving the public into believing that they originated with Plaintiff, rather than Defendant, that is only a part of the issue before the Court in this case.

In considering intent, the Court considers it appropriate and relevant to note that the testimony of Simpson Ma indicates that in marketing its Red Eraser line, M'Otto sailed past several clear warning flags which should have indicated to M'Otto that it might be infringing on Redsand's already existing marks. Thus, Mr. Ma testified that when he was at the Spring 1991 MAGIC Show, at which he was trying to market the Red Eraser marks as a private label, he was specifically asked by one visitor whether he "had a problem" with the existing Redsand marks (Tr. 116, 137). Mr. Ma checked with the MAGIC Show roster and found that Redsand was not an exhibitor. He asked several sales people whether they knew anything about Redsand, received negative responses, and dropped the matter (Tr. 138–139). Then, around June of that year, when he was trying to market the Red Eraser image in Canada, he received word from his Canadian attorney that Redsand was already registered in Canada. The communication included a photocopy of the Timmons' caricature (Ex. 80). In conferring with his own United States attorney (Mr. Stratton, counsel of record in this case), Mr. Ma was advised that there was no basis to protest the seniority of the Redsand mark in Canada and that to do so "could create problems for us in Canada, and possibly the United States, but let's not invite trouble" (Ex. 81). At the time of this warning, the apparel which would constitute the Red Eraser line had not been sewn together yet (Tr. 165). Mr. Ma chose to 'let sleeping dogs lie:' He decided not to request a trademark availability search on the Red Eraser image because he didn't believe his line was going to go anywhere, because no one had ever specifically told him that there was a similarity between the Redsand and Red Eraser images (Tr. 169); and because the Canadian registration indicated to him that Redsand's line of merchandise was restricted to volleyballs and certain athletic wear (Tr. 146–147).

In their proposed findings regarding the intent factor, Plaintiff's choose to concentrate on the logo (ex. C), rather than the caricature (Pl.Prop.Find. No. 77), and argue that although Defendant's witness Lusitania testified that the logo, in the colors displayed in ex. D had been used by Redsand for several years, the witness was unable to produce any early examples of its use. (*Id.*) The Court found Mr. Lusitania to be a credible witness on this point.

The evidence before the Court thus tends to show that while Plaintiff's initiated their marks with no conscious knowledge of the existence of the Redsand marks, and no intent to infringe on the senior Redsand marks, that they were in possession of information before actually putting their marks into substantial production and marketing, which might have clearly been interpreted by them as indications that they had a conflict with Redsand.

*Likelihood of Expansion*

The parties agree that the last factor, "likelihood of expansion," is concerned with the potential for confusion which might arise if the parties have plans to expand (or further expand) into each other's markets. (*AMF*, 599 F.2d at 354).

Here, the parties are already in each other's markets, which, as has been noted at several points in this order, exhibit substantial convergence. Further, the evidence of record establishes that these contacts between the parties are likely to increase, given Redsand's demonstrated history of moving from volleyball wear into more all purpose casual wear. Expansion is not only a "likelihood" but is virtually guaranteed, barring a change in Redsand's demonstrated business goals. This factor, accordingly, weighs more heavily in favor of Redsand.

## CONCLUSION

Having reviewed the eight factors outlined in *AMF*, the Court concludes that there is indeed a likelihood of confusion caused by M'Otto's use of the Red Eraser and logo. The evidence indicates that persons at both the retail and consumer levels of the market are likely to believe that Plaintiff M'Otto's product is associated with, or endorsed by, Redsand and/or Timmons.

## PROPRIETY OF AN INJUNCTION

■ In their proposed findings, Plaintiff M'Otto acknowledges that injunctive relief for Redsand is appropriate, but urges that it should be "a limited form of injunctive relief which will permit Plaintiff to continue use of its RED ERASER® + graphic design mark with an appropriate disclaimer worded to protect Redsand or Steve Timmons or both from association with or endorsement of M'Otto's RED ERASER® line." (Pl.Prop. Find. No. 80). Plaintiff provides an example of such a disclaimer which it feels will suffice. (*Id.*)

Defendant strenuously objects to this proposed solution, since it considers disclaimers ineffective in a case such as this one, because they are difficult to police and easily separated from the product. (Tr. 325). Defendant does not seek to enjoin Plaintiff from use of the words "Red Eraser," but from use of the caricature and the logo which are the subject of this suit. (Exs. A, C).

After carefully considering all of the evidence in this case, and the authorities cited by the parties, the Court concludes that the equities favor the grant of an injunction against M'Otto along the lines of that sought by Redsand. *See*, 15 U.S.C. § 1116. The harm to Redsand clearly outweighs the harm to M'Otto from the grant of the requested injunction.

Redsand has a single corporate image which is at risk if others are allowed to use confusingly similar logos and images. The evidence in this case establishes to the Court's satisfaction that there is not only a likelihood of confusion in this case, but that there has been actual confusion and that that confusion is likely to continue, with resulting manifest harm to Redsand.

There may well be harm to M'Otto from the issuance of an injunction on Redsand's behalf, but that harm occurs in the context of a party who took a calculated business risk that it would find itself in precisely such a position as it will now occupy.

Further, the Court has taken note of the evidence that M'Otto has not devoted much to advertising the Red Eraser line, which was created on short notice and with minimal effort by its in-house artistic personnel. Nor has it utilized the images in question for any substantial period of time. While it would, of course, prefer not to have to make the change, the evidence indicates that it could change the images in controversy with relative ease and without abandoning its nomenclature, the word mark RED ERASER.

Finally, the Court has carefully considered those cases cited by M'Otto in support of its claim that a disclaimer will suffice, but finds them unpersuasive. As M'Otto appears to recognize, the closest case of those it notes is probably *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F.Supp. 1220 (S.D.N.Y. 1977), *aff'd*, 580 F.2d 44 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The court therein found that a disclaimer would suffice, but the case

is actually very different from the one here. There, the court was faced with a dispute between a (senior) shoe line and a (junior) misses sportswear line, both of whom used the word "MUSHROOM." The goods were not competitive, however, and the senior shoe manufacturer, unlike the senior user here, had no realistic interest in expanding into the line of the junior user. In *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981 (2d Cir.1942), the court therein was faced with a situation in which the alleged infringer was utilizing his *own name* ("Stetson"). The courts have traditionally treated individuals who attempt to use their own legitimate names in business with more deference. (*E.g., Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719 (9th Cir.1985). This is not a case of an individual seeking to utilize his or her own name in a business endeavor. Nor are we concerned with fashioning a temporary solution to a problem, as was the court in *Pathfinder Communications Corp. v. Midwest Communication Co.*, 593 F.Supp. 281 (D.Ind. 1984), where a radio station was permitted to use its infringing call letters, with a disclaimer, until it could obtain approval from the FCC for change which would end the infringement. Finally, *N. Hess' Sons, Inc. v. Hess Apparel, Inc.*, 738 F.2d 1412 (4th Cir. 1984), is a split decision by a panel of the Fourth Circuit upholding the exercise of discretion by a District Judge who found a disclaimer acceptable despite similar business names and similar goods being sold in the same shopping center. The Court finds the dissenting opinion in *Hess* more persuasive.

The Court views a disclaimer of the type suggested by M'Otto to be ineffective in this case, which involves relatively inexpensive goods, and includes as its primary consumer groups, relatively young and unsophisticated purchasers. In addition, there exists the potential for policing problems as argued by Defendant Redsand. All told, the problem acknowledged by Red Eraser simply does not lend itself to the solution Plaintiff suggests.

### JUDGMENT
IT IS HEREBY ORDERED THAT:

M'Otto Enterprises, Inc., its officers, directors, principals, agents, servants, employees, representatives, suppliers, successors and assigns, and all those acting in concert or participation with them who receive actual notice of this Order are hereby enjoined from directly or indirectly using:

a. the caricature shown in Exhibit A hereto or any mark or image which is confusingly similar to the caricature of Steve Timmons shown in Exhibit B or the likeness of Steve Timmons, or

b. the logo shown in Exhibit C hereto or any logo which is confusingly similar to the logo of Redsand, Inc. shown in Exhibit D, and

M'Otto's claims for declaratory relief are denied.

Accordingly, the Clerk is directed to enter judgment in accordance with this Order and provide copies of these Findings and Conclusions to all counsel of record.